**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VICTOR NTAM**, | |
| *On behalf of himself individually and on behalf of two classes of Similarly Situated Persons.* | |
| Plaintiff, | |
| v. | Civil Case: 1:21-cv-01583-JMC |
| **PARAMOUNT RESIDENTIAL MORTGAGE GROUP, INC.,** | |
| *On its behalf individually and on behalf of a class of Similarly Situated Persons* | |
| Defendant. | |

## PLAINTIFF'S REPLY IN SUPPORT OF HIS MOTION FOR LEAVE TO FILE SECOND AMENDED & SUPPLEMENTAL COMPLAINT

Plaintiff, Victor Ntam ("Plaintiff" or "Ntam"), respectfully submits this reply in support of his motion for leave to file a Second Amended & Supplemental Complaint (ECF. 23)("Motion"). In reply to Defendant Paramount Residential Mortgage Group, Inc.'s ("PRMG")[1] opposition (ECF. 24), Plaintiff states as follows:

Defendant Paramount Residential Mortgage Group opposes (ECF. 24) Plaintiff's Motion for Leave to File a Second Amended and Supplemental Class Action Complaint (ECF No. 23)

---

[1] PRMG's counsel in this matter also represents Cenlar, FSB in this action. Although the opposition is styled as solely on behalf of PRMG, both entities are in privity based on the well-pled facts contained in Plaintiff's proposed amended pleading. While Plaintiff has sought the contract between PRMG and Cenlar in discovery, both have resisted all efforts for him to obtain it. So, the reasonable inference is that both PRMG and Cenlar are acting in concert and have the same, identical interests in this action in light of their relationship.

based on three basic grounds; (1) that the motion is untimely, (2) purportedly prejudicial, and (3) purportedly futile.  As will be discussed none of these reasons are availing and the Court should grant Plaintiff's Motion.

**I.     PLAINTIFF IS JUSTIFIED IN FILING THE MOTION AFTER THE DEADLINE TO AMEND HAS EXPIRED.**

As previously discussed in Plaintiff's Memorandum of Law (ECF. 23-1), Plaintiff has been attempting to conduct discovery since the onset of the case; however, every deposition notice, subpoena for documents, or other request permitted by the Rules of Civil Procedure has been met with objections, slow-walking, delays, and unilateral cancellations of depositions.  The sum of PRMG's and Cenlar's tactical decisions has frankly resulted in numerous, pointless, and unduly burdensome meet and confers.  This has substantially delayed Plaintiff's ability to discover the true facts in this case (that Cenlar is really running the show on behalf of PRMG in all aspects) which have now necessitated the addition of Cenlar as a party to this action.  Simply put, while Plaintiff acted diligently in pursuing relevant discovery, the Defendant and Cenlar elected to delay his efforts beyond the deadline for amendment and limited his access to the information necessary to timely move for leave to amend.  *Koelke v. Mayor and City Council of Cumberland,* 599 F.Supp.2d. 624, 629 (D.Md.2009). ("[A] movant must demonstrate that the reasons for the tardiness of his motion justify a departure from the rules set by the court in its scheduling order").

For example, PRMG's opposition (ECF. 24) conflates Plaintiff making allegations regarding Cenlar in his FAC with actually having proof of the illegal and nefarious conduct by them. Yes, it is correct that Plaintiff was aware that Cenlar was the sub-servicer for PRMG since June 2021 for some aspects of his mortgage loan, but he and his counsel did not know that Cenlar was actually the true servicing entity masquerading as PRMG in almost every aspect of Plaintiffs

2

interaction with PRMG.[2] In Plaintiff's First Amended Complaint (ECF. 9) Plaintiff merely alleged upon information and belief that Cenlar was responsible for payment processing, maintaining records of payments and balances, collecting and making disbursements for tax and insurance payments, sending monthly statements, etc. Amended Complaint (ECF. 9) at ¶¶ 7-8. However, only as learned in depositions and subsequent formal and informal discovery and investigation – which all took place AFTER the January 31st deadline – did Cenlar's substantial role become revealed.

Post-deadline, Plaintiff learned, in addition to the facts set forth in the Memorandum of Law (ECF. 23-1) that Cenlar, rather than PRMG, controls and services every aspect of the loan after the initial interim servicing by PRMG. This includes answering phone calls, sending communications, receiving and responding to QWR/NOE's, credit reporting, in addition to receiving and processing payments sent by Plaintiff directly or that are sent to PRMG.

In fact, it has been learned that Cenlar actually uses another third-party (Crane Consulting and Outsourcing, "CCO") to perform a number of those functions. This was not learned until the deposition of the QWR/NOE investigator Jennifer Vaden who held herself out to be an employee of PRMG when dealing with PRMG customers like the Plaintiff, but in fact was not employed by PRMG but by a vendor (i.e., CCO) used by Cenlar. Plaintiff had initially set the 30(b)(1) deposition of the (at the time unknown) investigator for November 10, 2021, but

---

[2]      For example, no reasonable person would have assumed that the negative and derogatory crediting reporting by Cenlar to the credit reporting agencies would have been done by it using PRMG's name.  The Fair Credit Reporting Act requires the actual source of the credit information to be reported to consumers.  15 U.S.C. §1681g(a)(2).  Here, only through the delayed discovery was Plaintiff able to learn this true fact that Cenlar and the credit reporting agencies are misreporting the source of Plaintiff's and the putative class members' credit information as PRMG (and members of the Defendant Class) and not the actual source—i.e., Cenlar.  SASC ¶¶ 17, 30, 36, 41.

the Defendant could not produce the proper witness. Defendant's counsel allegedly did not even know the reality concerning Ms. Vaden's true employment until February 3, 2022 when counsel for Defendant informed Plaintiff's counsel that Ms. Vaden was not an employee of PRMG or Cenlar but an unknown 3rd party (now known to be CCO) and her deposition did not occur until March 12, 2022 after numerous attempts to schedule sooner by Plaintiff. In order to accommodate the witness and finally conduct the deposition Plaintiff's counsel deposed Ms. Vaden on a Saturday.

Similarly, the deposition of PRMG's director of loan servicing, Christy Christensen was originally noticed for December 21, 2021, then agreed to occur on January 21, 2022, but was unilaterally canceled by the Defendant on January 14, 2022, without the consent or agreement of the Plaintiff, and finally took place on February 15, 2022. In that deposition Ms. Christensen identified several documents that had not been produced in response to prior served requests for production. These documents were requested after reviewing Ms. Christensen's transcript on March 3, 2022; have still not been produced, and were not even objected to or agreed to be produced until an email from Defendant's counsel on April 26, 2022 (but as of this filing the supplemental production has still not occurred).

This pattern and practice of not responding to discovery, canceling depositions, and otherwise slow-walking discovery has infected every step of Plaintiff's attempted discovery[3]. Thus, contrary to Defendant's allegations, none of this newly learned information was public knowledge and Plaintiff acted with great diligence in attempting to depose numerous witnesses

---

[3]   Additionally, there are still two depositions of PRMG employees outstanding which have been noticed and re-noticed since November 30, 2021. Unless canceled again by Defendant (the last time being February 23rd which was canceled by Defendant for witness illness) are now scheduled for May 9 and May 17, 2022.

in this matter but was repeatedly delayed and stymied by the Defendant. It should be noted, that while the Defendant is complaining of undue delay it is simultaneously attempting to extend its expert-witness deadline of May 1, 2022, for an additional two months[4] when it did not even issue subpoenas for the information it claims it desperately needs to defend this case until March 2, 2022.

Also contrary to Defendant's position, Plaintiff did discuss and analyze Rule 16 (and Rule 21) in his Memorandum of Law at 6-7, 10-11. Plaintiff has explained in its Memorandum and herein, in great detail, the multitude of delays, obstruction by the Defendant, and diligence by the Plaintiff such that good cause exists to allow the late filing of a Second Amended Complaint.

The Defendant's and Cenlar's tactical decisions to delay discovery should not be used to defeat the Motion. Such a result is counter to Rule 16 and Rule 1. *See also* Ex. 1, Affidavit of Counsel outlining the discovery delays encountered by Plaintiff in this matter.

## II.   DEFENDANT AND CENLAR WILL NOT BE UNFAIRLY PREJUDICED

As alluded to *supra,* the Defendant apparently wants to have its cake and eat it too by both accusing Plaintiff of causing Defendant prejudice with undue delay on the one hand but moving the Court to modify its scheduling order on the other. Plaintiff in his Memorandum engaged in a thorough discussion explaining why neither PRMG nor Cenlar would be prejudiced by the filing of the SASC. *See* Memo (ECF. 23-1) at 7-8. This is especially so if the Court extends Defendant's expert witness deadline.

Defendant asserts that "allowing Plaintiff to amend would potentially deprive Cenlar of the opportunity to disclose an expert, and would leave little or no time for PRMG and Cenlar to conduct discovery into 'Plaintiff's individual claims and class certification issues.'" Opp. at 10.

---

[4] See ECF. 25 filed April 28, 2022

However, as set forth in Plaintiff's Memorandum the facts are nearly identical between PRMG and Cenlar, they have the same counsel, and Cenlar has participated in this case nearly since its inception and is well aware of the facts. Defendant does not cite to any new facts asserted by Plaintiff in the proposed SASC or explain how the addition of Cenlar would require additional discovery beyond that which has occurred or is set to occur.[5] Additionally, as mentioned in Plaintiff's Memorandum, Cenlar was served a subpoena on October 29, 2021 (to which it still has not responded other than raising objections) and thus knows precisely what the issues are and what discovery is sought from it. *Id.* at 10. *See Georgacarakos v. Wiley*, 2010 WL 1291833, at *24 (D. Colo. Mar. 30, 2010). There are no new surprise allegations, discovery requests, or any other reason that PRMG or Cenlar would be prejudiced and thus the amendment should be allowed. *See Bronner v Dugan* 324 F.R.D. 285, 291-292 (D.D.C. 2018). Finally, in an effort to continue good-faith discovery, despite Plaintiff previously appearing for a 7-hour deposition he has agreed to be deposed again for a limited time (i.e. two additional hours).

### III.   PLAINTIFF'S PROPOSED AMENDMENT IS NOT FUTILE BECAUSE CENLAR IS A SERVICER UNDER RESPA

PRMG also opposes Plaintiffs' motion on the misguided basis that "Cenlar is not a 'servicer' under RESPA." Opp. at 10 (emphasis removed). On that theory, PRMG claims the amendment would be futile and the Motion should be denied on this alternative basis. *Id.* at 10-13. PRMG is wrong on the facts and law. More alarming is PRMG's (and Cenlar's) apparent wish to have the Court hold that Cenlar's business model of acting as a secret servicer in multiple material aspects while borrowing and utilizing the names of its clients, including PRMG, allows it to avoid the remedial protections enacted by Congress to protect mortgage borrowers like Ntam

---

[5]     The depositions of two of PRMG's employees, all three credit reporting agencies, and Cenlar's third-party payment processor (Regulus) are all scheduled next week.

and the putative class members in this action.  The Court should reject PRMG's argument which is best left to Congress if Cenlar wishes to continue to conduct its business in secret.

A.  <u>The Plain Language of RESPA's Definitions of Servicer and Servicing Apply to Cenlar</u>

Avoiding the actual definitions in 12 U.S.C. § 2605, Cenlar claims by acting as an undefined term--i.e., subservicer—it is exempt from RESPA's scope.  Opp. at 10.  While clearly Cenlar and its client PRMG would likely like the opportunity for Cenlar to avoid supervision under RESPA, that conclusion cannot be accomplished by a mere label utilized by Cenlar.

RESPA defines "'servicer' [to] mean[] the person responsible for servicing of a loan."  12 U.S.C. § 2605(i)(2).  In turn, RESPA defines "'servicing' [to] mean[] receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts…, and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan."  12 U.S.C. § 2605(i)(3).[6]  The Consumer Financial Protection Bureau's further

---

[6]    The proposed, well pled facts in the SASC qualify Cenlar as a servicer pursuant to § 2605(i).  *See e.g.* SASC at ¶ 17(c)(identifying Cenlar as the source of derogatory credit information about the Plaintiff and putative class members as the "the mortgage servicer assigned to collect upon the Plaintiff's loan and the loans of the RESPA Class"), 17(e) (explaining Cenlar's role as the  "furnisher of credit information to the credit reporting agencies [in relation to]…the trade lines associated with the Plaintiff and the RESPA Class members identified in the name of PRMG and other members of the Defendant Class in relation to the Plaintiff's loan and the similar loans of the RESPA Class members"); ¶ 21 (identifying Cenlar's role in conducting investigations of "qualified written requests and notices of error subject to this action in relation to the RESPA Class"); ¶ 40 (detailing Cenlar's collection and processing of Ntam's payments); ¶ 42 (explaining PRMG's effort to get Cenlar to correct its payments records related to Ntam's missing November 2020 payment that was received but not credited to Ntam's account and "Cenlar represented to PRMG that it would 'absolutely' correct the issue but instead recklessly chose not to do so (until long after this action was commenced)"); ¶ 44 (Cenlar threatened Ntam with derogatory actions for months); ¶¶ 47-53 (describing Cenlar's failure to properly investigate Ntam's qualified written request and production of false and misleading purported correspondence to conceal its failures); ¶¶ 57-60 (identifying Ntam's payments going to an address controlled by Cenlar as of July 2021); ¶¶ 61 (describing Cenlar's failure to promptly credit Ntam's July 2021 payment on behalf of

regulations support Plaintiff's view of Cenlar's role as servicer even if it utilizes the label of "subservicer" as part of its work.  First, the CFPB's regulations define subservicer to "mean[] a servicer that does not own the right to perform servicing, but that performs servicing on behalf of the master servicer." 12 C.F.R. § 1024.31.  When the CFPB wished to exempt subservicers from certain of its requirements it did so expressly.  12 C.F.R. § 1024.33(b)(exempting transfer notices resulting from "from mergers or acquisitions of servicers or subservicers" or transfers occurring "between master servicers without changing the subservicer").  Yet, in the regulation at issue in this case, i.e., 12 C.F.R. § 1024.35(i), as related to notices of error and the suppression of adverse information to a credit reporting agency, the CFPB did not exempt subservicers from the requirement.

Based upon the well pled facts of the proposed SASC (*see* FN 6 and ECF. 23-2), Cenlar qualifies as 'servicer' pursuant to 12 U.S.C. § 2605(i).  While Cenlar and PRMG have objected to every single discovery effort by Plaintiff and refused to produce Cenlar's contract with PRMG (see Argument § I *supra*), the limited discovery now confirms for the first time that the servicing functions in § 2605 are carried out by Cenlar using the names of PRMG and its other clients, and Cenlar contracts out to others portions of its § 2605(i) responsibilities.   Of importance here, Cenlar's business model – which is to conceal its identity to the least sophisticated consumer for whom it collects mortgage loans – prevents any consumer, the Plaintiff, and even Plaintiff's counsel from understanding the true nature of its § 2605(i) servicing role until formal discovery reveals the true facts.  SASC at ¶ 17(a) ("Cenlar as the servicer…conceals its role from borrowers"

---

PRMG and the consequences that arose as a result); ¶ 96 ("Cenlar is also a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41 in relation to the Named Plaintiff and RESPA Class members even though it is undisclosed as such as part of its private label servicing").

in contrast to "industry standards and customs of the remedial purposes of RESPA"), ¶¶ 36, 41, 91 (describing Cenlar's election to conceal its role and if it had not so disclosed "Plaintiff and the members of the RESPA class…could have addressed their complaints and errors to the OCC as Cenlar's regulator.  By concealing its identity Cenlar also kept the OCC in the dark just how bad its business was in this regard since no RESPA members knew the OCC was an option for help").

Congress did choose to exempt multiple entities from the scope of servicing in to 12 U.S.C. § 2605(i).  These exempted entities include the FDIC, Fannie Mae, Freddie Mac, and other specified actors in the mortgage world.  12 U.S.C. § 2605(i)(2)(A)(B).  However, Congress did not exempt Cenlar and other persons who qualify as "servicers" as defined by § 2605(i) when acting in secret.  *Id.*

> Any exemption from such humanitarian and remedial legislation must…be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people.

*A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945).  *See also Consolidation Coal Co. v. Williams*, 453 F.3d 609, 618 (4th Cir. 2006)(recognizing that "'[c]ourts should liberally construe remedial legislation…so as to include the largest number of claimants within its entitlement provisions'")(quoting *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 318 (3d Cir. 1995)).

PRMG and the members of the Defendant Class "are of course free to allocate responsibilities by contract. But a…contractual responsibility [related to RESPA]…has no effect on the…statutory obligation" and scope of the statute.  *Harrell v. Freedom Mortg. Corp.,* 976 F.3d 434, 443 (4th Cir. 2020).  In *Harrell* the CFPB responded to similar contractual argument advanced

here and explained why PRMG's argument that its agreement with Cenlar should prevent Cenlar

from being subject to RESPA was wrongheaded.

> The contrary view would undermine the purposes of RESPA Section 6 and the
> protections it provides consumers by allowing companies to contract away their
> legal status as "servicers" in piecemeal fashion, creating confusion for borrowers
> and companies both. A consumer might, for example, be entirely unaware that his
> or her servicer has subcontracted for others to assist in carrying out certain servicing
> functions. Such a consumer may have no way to know about these side agreements,
> to which the consumer of course would not be a party. Under Freedom's view, the
> consumer would seem to have no redress in the event of a RESPA violation unless
> he or she could successfully unmask the "real" servicer at issue.

Rodney W. HARRELL, Plaintiff-Appellant, v. FREEDOM MORTGAGE CORP., Defendant-

Appellee., Br. of Amicus Curiae Consumer Financial Protection Bureau, 2019 WL 3543495

(C.A.4), 20.[7]

Based upon the foregoing argument and the plain language of § 2605 and the well-pled

proposed facts of the SASC, Cenlar qualifies as a servicer under RESPA and the Court should

respectfully reject PRMG's request for a ruling to exempt Cenlar from the scope of RESPA while

acting in secret (using the PRMG's name) to perform the duties and responsibilities detailed in §

2605 and the proposed SASC.  Congress did not exclude actors like Cenlar from RESPA's scope

and the Court should decline to do so as well.  If Cenlar does not wish to be governed by RESPA

it should seek relief from Congress.

### B.  RESPA is a Remedial Consumer Protection Statute

---

[7]      If the Court feels it is necessary, it may exercise its discretion and invite the CFPB to
provide the Court its view of whether Cenlar's business model of acting as a secret servicer using
the names of its clients while servicing mortgage loans excludes it from the scope of RESPA and
Regulation X.  *Naimoli v. Ocwen Loan Servicing, LLC,* 22 F.4th 376, 381 (2d Cir. 2022) ("After
oral argument, the panel solicited and received the views of the Consumer Financial Protection
Bureau (CFPB) concerning the interpretation of the relevant portions of RESPA and Regulation
X").

It is important to understand when considering PRMG's claim that Cenlar is not subject to RESPA and its underlying regulations, that the statute and related regulations are remedial, consumer protections intended to protect Mr. Ntam and millions of other mortgage borrowers like him across the country.   *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014); *Renfroe*, 822 F.3d at 1244.

> Congress enacted RESPA to provide consumers "with greater and more timely information on the nature and costs of the settlement process." 12 U.S.C. § 2601(a). To serve this purpose, Congress required loan servicers to respond to inquiries from borrowers seeking information about their accounts or to correct accounting errors. § 2605(e). If loan servicers could respond to those inquires after conducting perfunctory examinations, then consumers would be unable to obtain "greater or more timely information." § 2601(a). "It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate information [regarding their loan accounts], Congress used the term 'investigation' to include superficial, *un*reasonable inquiries by [loan servicers]." *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 430–31 (4th Cir. 2004).

*Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 717 (8th Cir. 2018), reh'g denied (May 29, 2018).   *See also Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665–66 (9th Cir. 2012)("Congress intended RESPA to serve consumer-protection purposes….the scope of the statute's provisions was expanded in 1990 to encompass loan servicing, Pub. L. No. 101–625, tit. IX, subtit. C, § 941, 104 Stat. 4405 (1990). Accordingly, RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose"); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583, 589 (7th Cir. 2016).

"Remedial laws are to be interpreted in the light of previous experience and prior enactments." *United States v. Cong. of Indus. Organizations*, 335 U.S. 106, 112–13 (1948). "[R]emedial legislation should [also] be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

In addition, once it is determined that a statute is remedial, so too are any regulations promulgated under it which also must be construed broadly.  *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994); *Patel v. Thompson*, 319 F.3d 1317, 1319 (11th Cir. 2003).  *See also* 3 Sutherland Statutory Construction § 60:1 (7th ed.)("Courts should not read into a remedial statute an exception that would impose obstacles to the achievement of its purpose;" and once a statute is determined to be remedial, "the regulations regarding exclusion are *a fortiori* remedial").

The RESPA remedial rights at issue in this action were recently addressed by the Fourth Circuit who summed up the right and protection intended by Congress as follows:

> In relevant part, RESPA provides that loan servicers have a duty to respond to any QWR received from borrowers "for information relating to the servicing of the loan." 12 U.S.C. § 2605(e). Further, when a loan servicer receives a QWR, that servicer has a duty to refrain from "provid[ing] information regarding any overdue payment, owed by such borrower and relating to such period [of sixty days from the servicer's receipt of a QWR] or [QWR], to any consumer reporting agency." *Id.*
>
> The CFPB has enforcement authority for RESPA. The CFPB has issued Regulation X to interpret and implement RESPA. Regulation X provides guidance with regard to QWRs that assert an error, as well as guidance with regard to what constitutes "servicing."

*Morgan v. Caliber Home Loans, Inc.*, 26 F.4th 643, 648 (4th Cir. 2022).

A second, RESPA remedial right at issue in this case was described by the Second Circuit as follows:

> One of RESPA's implementing regulations, Regulation X, "allows borrowers to notify mortgage servicers of possible account errors." *Finster v. U.S. Bank Nat'l Ass'n*, 723 F. App'x 877, 878 (11th Cir. 2018). Regulation X requires servicers to respond to "any written notice from the borrower that asserts an error and that includes ... information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a). However, the Regulation applies only to the "covered errors" listed in § 1024.35(b)....[but requires a] 'substantive response' to the notice of error, and that such a response would include either '[c]orrecting the error' or '[c]onducting a reasonable investigation.' T

*Naimoli v. Ocwen Loan Servicing, LLC*, 22 F.4th 376, 379, 385-86 (2d Cir. 2022).

To carry out the rights and protections of RESPA subject to this action, as described in *Harrell v. Freedom Mortg. Corp.*, 976 F.3d 434, 437 (4th Cir. 2020), "Congress gave [RESPA] teeth…[and] sanctions certain private rights of action." *Id.* Part of the added 'teeth' related to the proposed SASC is Mr. Ntam's right and the right of the putative class members to seek statutory damages under § 2605(f)(1)(B). Accepting PRMG's argument that disregards not only the well pled facts but also the public facts, would not promote the remedial nature of RESPA and its regulations and create a cavity in RESPA's teeth never intended by Congress. *Compare* Br. of *Amicus Curiae* CFPB in *Harrell*, 2019 WL 3543495 at 20.

Therefore, for these additional reasons Mr. Ntam requests the Court to reject PRMG's futility argument and grant him leave to amend and file with the Court his SASC.

## C.  **PRMG's Authorities Do Not Involve Servicers as Defined under RESPA**

To advance its conclusion that even though Cenlar performs the functions of a servicer as defined by § 2605(i), Cenlar is not subject to RESPA and Regulation, PRMG relies on cases inapposite to the matter before the Court here.  Opp. at 12-13.

Without any candid analysis to the Court or the Plaintiff, PRMG claims its first authority to support its theory—i.e., *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079 (W.D. Wash. 2013)—stands for the proposition that "RESPA does not apply to subservicer as a matter of law." Opp. at 12.  The holding in *McDonald* embraced by PRMG did not however actually involve a subservicer performing servicing functions defined in § 2605(i) in the name of another like Cenlar in this case.  *See* Argument § I *supra*.  Rather the holding was in favor of dismissing RESPA claims asserted against Mortgage Electronic Registration Systems, Inc. ("MERS") and Northwest Trustee

Services, Inc ("NWTS").[8]   The court held neither MERS nor NWTS were acting as servicers. *McDonald,* 929 F. Supp. 2d at 1095.  *McDonald* never held, as PRMG represents to this Court, that subservicers are exempt from RESPA.  *Id.*   The term subservicer does not even appear in McDonald. *Id.*

Next, relying upon a *pro se* plaintiff case, *In re Coleman,* No. 06-00254, 2009 WL 9061560, at *1 (Bankr. D.D.C. May 11, 2009), PRMG attempts to argue that since lawyers are not subject to RESPA, Cenlar should also not be subject to it.  Opp. at 12.  First, PRMG's excerpt misses the point of the court's ruling in *Coleman*.  It was not holding that the borrower's RESPA claim was invalid because the borrower could not sue the lawyer under RESPA.  Instead, *Coleman* found the borrowers RESPA claim failed because the qualified written request under a pre-Dodd-Frank version of RESPA could not be sent to the servicer's attorneys but had to be sent to the servicer itself.  *Coleman,* 2009 WL 9061560, at *10 ("The statute does not identify the servicer's counsel as an authorized agent of the servicer for purposes of receiving and responding to RESPA requests").

PRMG's third authority--*Farber v. Brock & Scott, LLC*, No. CV TDC-16-0117, 2016 WL 5867042 (D. Md. Oct. 6, 2016) --also did not concern involve a servicer but the actions of foreclosure law firm acting on behalf of the servicer in alleged violation of RESPA by scheduling and advertising a foreclosure sale at a time RESPA prohibited such activity.  *Farber,* 2016 WL 5867042, at *2.  Unlike the proposed, well pled facts before the Court in this case identifying Cenlar as a servicer and conducting itself as a servicer, the borrowers in *Farber* did not allege

---

[8]   In the loan in question in *McDonald*, MERS was identified not as a subservicer but as "lender's nominee to act as the beneficiary."  *McDonald,* 929 F. Supp. 2d at 1085.  NWTS's role was also not as a subservicer but as a "trustee" who sent a "notice of default" required under state law.  *Id.*

that Brock & Scott was the servicer on their mortgage, or that Brock & Scott was responsible for receiving and applying scheduled periodic mortgage payments. In fact, the Farbers acknowledge that Brock & Scott is a "non-servicer." Compl. ¶ 44. Consequently, the Farbers cannot state a claim against Brock & Scott under 12 U.S.C. § 2605 or 12 C.F.R. § 1024.41.

*Farber,* 2016 WL 5867042, at *3.

*Farber* also specifically found the foreclosure firm was "a non-servicer" and therefore not subject to RESPA. *Id.* at *5.

PRMG's last authority—*Kee v. Fifth Third Bank*, No. 2:06CV00602CW, 2009 WL 735048 (D. Utah Mar. 18, 2009)—concerns similar inapposite facts than are before the Court in this case. In *Kee*, the court held that "written communications sent by Kee to the Bank's attorney did not constitute qualified written requests because they were not sent to the loan servicer." *Id.* at *4. So, the issue before the court in *Kee* was not whether a person qualified as a servicer but whether the borrower properly sent his correspondence to the servicer as then required under RESPA. *Id.* He did not do so and therefore his correspondence did not qualify under RESPA as a qualified written request and RESPA therefore did not apply to his claims against the servicer. *Id.*

None of the authorities relied upon by PRMG's RESPA argument apply to the well pled, proposed facts before the Court. Cenlar is not a trustee, it is not the lender's nominee, and it is not a law firm or attorney. Nor is there any dispute that Ntam's QWR/NOE went to the address published by PRMG and Cenlar to him (and hundreds of others) for such correspondence.

## IV.   PLAINTIFF SHOULD BE ALLOWED TO SUPPLEMENT HIS FIRST AMENDED COMPLAINT AS HE HAS LEARNED NEW INFORMATION SINCE ITS FILING.

Defendant again misstates the facts and periods of time in which new facts came to light. In addition to the facts discussed *supra.* Defendant's citation of the alleged QWR response is a perfect example. PRMG asserts that this letter was produced on December 22, 2021; this is

correct. What PRMG then conceals from the Court is that PRMG_Ntam000701,[9] which is alleged

to be the tracking information for said letter, was not produced until February 25, 2022, two

months after the alleged letter production and a month after the amendment deadline.

Additionally, PRMG_Ntam000701 has absolutely no indication that it refers to the alleged QWR

response but is rather apparently a screenshot of unknown origin and purpose, has not been

authenticated, and most of all is contrary to sworn testimony of the Defendant's only agent with

any knowledge of Plaintiff's dispute <u>preceding</u> the production of that document.

### <u>PRMG 30(b)(1) Testimony (by Designee C Christensen) (2/15/2022)</u>

Q    The letter -- for example, let's take the one from the bottom.  It's a -- there's a letter that has a code XC846 Conv Counsel Agency Adv. A    Yes. Q    Probably a code list that specific letter is; is that right, from your somewhere telling us what experience? A    Yes. Q    All right.  But it -- it suggests that a letter was sent on that date; correct? A    Yes. Q All right.  And then if you go up further, the one above that, the SCRA Notice, the Loss Mit-Convent noti- -- or it says "LETTER SENT" next to those; right? A    Yes. Q    All right.  Then on like the third from the top, there's one on February 18th, "FNMA 17 day delq NTCE LETTER SENT"; correct? A    Yes. Q    All right.  And then if you go to the preer -- previous page, which is PRMG_Ntam 378, at the top of that page on March 24, 2021, it says, "QWR EXTENSION LETTER SENT"; right? A    Yes. Q    And then on April 6 -- if you go to the next page, PRMG_Ntam000377, do -- do you see anywhere on that page it says the QWR response was sent? A    No. Q    Okay.  If you go to the prior page to that, PMRG -- MG_Ntam 376, do you see anything on that page that says the QWR response was sent? A    No.  Q    And if you go to the previous page, PRMG_Ntam 375, do you see anything on that page that says the QWR response was sent? A    No. Q    And if you go to the previous page of PMRG_Ntam 374, do you see anything on that page indicating that the QWR response was sent? A    No. Q    And if you go to PMRG_Ntam000373, do you see anything on that page that says the QWR response was sent? A    No. Q    And if you go to PMRG_Ntam 372, do you see anything on that page that says the QWR response was sent? A    No.   Q    And if you go to PMRG_Ntam 371, do you see anything on that page that the QWR response was sent? A    No. Q    And if you go to the first page, PMRG_Ntam 37, do you see anything on that page that says that the QWR response was sent? A    No. Q    Do you know of any facts that PRMG sent a response to Mr. Ntam's QW -- QWR notice of error? … Objection. THE WITNESS: I don't know. … Q    Okay.  Do you know of any facts that this exhibit which purports to be a letter from Jennifer Vaden to Mr. Ntam on behalf of PRMG

---

[9]        *See* Exhibit 2.

was ever mailed to Mr. Ntam?   A    I don't know.

Ex. 3, PRMG Designee Dep. (Christensen) (2/15/2022) 82:3-85:2

This is but one example. Plaintiff will not rehash all the supplemental facts here, as his Memorandum and proposed SASC includes the supplemental factual allegations about Cenlar and PRMG's dereliction of their statutory duties to Ntam and the proposed TILA class members by failing to promptly credit the monthly mortgage payments received from Ntam and the TILA Class members pursuant to 15 U.S.C.A. § 1639f; 12 C.F.R. § 1026.36(c)(1)(i). *See e.g.,* SASC at ¶¶ 4, 7-8, 17(d), 61 and supplemental factual allegations about Cenlar's pattern and practice of errors, misrepresentations, and failures to comply with basic fundamental functions while acting as a mortgage servicing vendor on a "private label" basis. See e.g., SASC at ¶¶ 30, 31, 102, Memo at 3-4.

## CONCLUSION

Because the proposed SASC would not be prejudicial to PRMG or Cenlar and is made with good cause, is not being presented in bad faith, and would not be futile, the Court should grant the Plaintiff leave to amend.

[signatures on next page]

Respectfully submitted,

*/s/Phillip R. Robinson*
Phillip R. Robinson
Bar No. MD27824
Consumer Law Center LLC
10125 Colesville Road, Suite 378
Silver Spring, MD  20901
Phone (301) 448-1304

Brent S. Snyder
*Admitted Pro Hac Vice*
2125 Middlebrook Pike
Knoxville, TN 37921.
Phone: (865) 264-3328
brentsnyder77@gmail.com

Robert P. Cocco
*Admitted Pro Hac Vice*
1500 Walnut Street - Suite 900
Philadelphia, PA  19102
Phone: (215) 351-0200
bob.cocco@phillyconsumerlaw.com

*Counsel for the Class and Putative RESPA Class & TILA Class Members*

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing and attached exhibits were sent to the

following counsel for the Defendant when filed with the Court's CM/ECF system:

Carlos Marin
Dale Evans
Thomas Cunningham
Regina McClendon
Locke Lord LLP
777 South Flagler Drive
East Tower, Suite 215
West Palm Beach, FL  33458
Carlos.Marin@lockelord.com
Dale.Evans@lockelord.com
TCunningham@locklord.com
RMclendon@locklord.com

/s/ Phillip Robinson
Phillip Robinson