## IN THE UNITED STATES DISTRICT COURT FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| **VICTOR NTAM**<br>*On behalf of himself individually and on behalf of two classes of similarly situated persons.*<br><br>Plaintiff<br><br>*v.*<br><br>**PARAMOUNT RESIDENTIAL MORTGAGE GROUP, INC.**<br>*On behalf of itself individually and on behalf of a class of similarly situated persons*<br><br>And<br><br>**CENLAR FSB**<br>425 Phillips Blvd.<br>Ewing, NJ 08618<br><u>SERVE ON:</u><br>Gregory S. Tornguist, CEO<br>425 Phillips Blvd.<br>Ewing, NJ 08618<br><br>Defendants | Civil Case:<br><br>1:21-cv-01583-JMC<br><br><br>***JURY TRIAL DEMAND*** |

## SECOND AMENDED & SUPPLEMENTAL CLASS ACTION COMPLAINT[1,2]

Plaintiff Victor Ntam ("**Ntam**" or  "**Named Plaintiff**"), on his individual behalf and on

behalf of two classes of similarly situated individuals ("RESPA Class" and "TILA Class") defined

*infra*, by his attorneys, Phillip R. Robinson and the Consumer Law Center LLC,  Brent S. Snyder,

---

[1]    Exhibit 1 attached hereto is a comparison copies of the changes and additions made by this pleading.

[2]    Defendant has not consented to the filing of this second amended and supplemental pleading pursuant to Fed. R. Civ. P. 15.

and Robert Cocco, pursuant to Fed.R.Civ.P. 23 (Class Actions), sues Paramount Residential Mortgage Group, Inc. ("PRMG"), on its behalf and on behalf of a class of similar persons ("Defendant Class") as defined *infra* and also Cenlar, FSB ("Cenlar").  The Plaintiff, on behalf of himself and others similarly situated as defined herein, demands a trial by Jury on all counts for which a right to trial by jury is allowed and, in support of his Second Amended and Supplemental Class Action Complaint, states:

### INTRODUCTION

1.      In these instances, such as the underlying matters involving Cenlar, PRMG and members of the Defendant Class, the mortgage actor places its interest and pattern of unsafe and unsound mortgage service practices above the remedial rights of homeowners and consumers. Moreover, PRMG and the members of the Defendant Class unfairly and deceptively ignore their statutory and contractual duties, including those which were agreed to as part of its license/registration to legally operate in the District of Columbia and nationwide.   In addition, in relation to the issues before the Court in this action PRMG and the members of the Defendant Class know their agent Cenlar is acting unsafely and unsoundly but they have continued to engage Cenlar to do work in their names which wrongfully infects the Plaintiff's putative class members' residential mortgages.

2.      These practices are compounded when homeowners, like Ntam and the putative RESPA Class members, try in good faith to resolve their situation, but Cenlar and PRMG disregard their duties to conduct a reasonable investigation of the notices of error and instead makes material misstatements of law and fact in reply, which confirm the underlying claim in this matter—i.e., that PRMG and Cenlar as a pattern and practice regularly violates their remedial, statutory duty

pursuant to Real Estate Settlement Procedures Act, 12 U.S.C.A. § 2605(e)(3)("RESPA") which states:

> During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15).

*Id.*

3.      Under its authority granted to it pursuant to Dodd-Frank legislation, the Consumer Financial Protection Bureau ("CFPB") has further imposed this duty on PRMG and Cenlar in 12 C.F.R. § 1024.35(i)(1)("After receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error").  However, as shown *infra*, PRMG and Cenlar have also failed their mandatory duty to "comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter" which includes 12 C.F.R. § 1024.35(i)(1).   12 U.S.C.A. § 2605(k)(1)(E).

4.      In addition, PRMG and the members of the Defendant Class have duties under the Federal Truth in Lending Act. 15 U.S.C. § 1601, *et seq.* and its regulations ("TILA") to promptly credit payments received by then from mortgage borrowers like Ntam and the members of the TILA Class defined *infra*.  15 U.S.C.A. § 1639f; 12 C.F.R. § 1026.36(c)(1)(i).  Yet, as shown *infra*, PRMG and the Defendant Class members have delegated their responsibilities to Cenlar, FSB ("Cenlar") and Cenlar on their behalf has failed to promptly credit payments received from borrowers while imposing and/or collecting late and other fees that would not have occurred if Ntam's and the TILA Class members' payments been promptly credited.

5.      There is no question that RESPA was intended and is considered remedial legislation. *See e.g. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013)("As a remedial statute, RESPA is construed broadly to effectuate its purposes"); *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012)("RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose"). *See also* DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, July 21, 2010, 124 Stat 1376. Dodd-Frank was specifically enacted to "improv[e] accountability and transparency in the financial system…[and] to protect consumers from abusive financial services practices." *Id.* In addition, there is no dispute that TILA also was intended and is considered remedial legislation. *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 892 (D.C. Cir. 2004); *Freeman v. B & B Assocs.*, 790 F.2d 145, 149 (D.C. Cir. 1986); *Harris v. CitiMortgage, Inc.*, 878 F. Supp. 2d 154, 160 (D.D.C. 2012).

6.      Notwithstanding their legal duties, PRMG and Cenlar disregard the express requirements in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) to suppress from furnishing or providing adverse information to any consumer reporting agency regarding any payments or sums demanded due that are subject of the Qualified Written Requests/Notices of Error ("QWR/NOE") received from the Plaintiff and RESPA Class members for a period of sixty days. PRMG and Cenlar simply continue the disputed, adverse reporting with knowing and reckless disregard to the rights of the Plaintiff and RESPA Class members.

7.      Further, PRMG and the Defendant Class members delegate their legal duty to promptly credit payments received from the Plaintiff and TILA class members pursuant to 15 U.S.C.A. § 1639f and 12 C.F.R. § 1026.36(c)(1)(i) to their authorized agent Cenlar. However, the mere delegation of their legal duty does not absolve PRMG's and the Defendant Class members'

liability for failing to promptly credit the payments received from the Plaintiff and TILA Class members.

8.      As a direct and proximate result of violations of 15 U.S.C.A. § 1639f and 12 C.F.R. § 1026.36(c)(1)(i) by PRMG and members of the Defendant Class to not promptly credit payments received, Ntam and the TILA Class members have been harmed and damaged by the imposition of and/or collection of late and other fees and charges added onto their accounts which lead to unlawful threats of foreclosure and other defamatory statements to put the Ntam and the TILA Class members in a false, negative light.

9.      As is the case here with PRMG's and Cenlar's underlying acts and omissions, mortgage servicer collectors place their interests and pattern of unsafe and unsound collection practices above the remedial rights of homeowners and consumers. Cenlar, acting on behalf of PRMG and others, routinely unfairly and deceptively ignores its statutory and contractual duties, including those which were agreed to as part of its duty to act safely and soundly.   These conclusions are known to PRMG and the Defendant Class members and supported by the facts discussed *infra* and also in the public admissions of its authorized agent/vendor—Cenlar—which include:

        a.      The findings of the Office of the Comptroller of the Currency ("OCC") published on October 26, 2021, which found Cenlar failed to establish effective controls and risk management practices related to its business as a subservicing agent/vendor for PRMG and the members of the Defendant Class. *See* Ex. 2, OCC-Cenlar Consent Order.

        b.      The specific finding by the OCC that Cenlar failed, within its first line operations, to take timely corrective actions to respond to issues, remediate known risks, and otherwise be accountable for its subservicing work on behalf of PRMG and others like it even though it had previously been notified of such issues.

c.      The OCC's February 11, 2022, correspondence to Cenlar finding that Cenlar's mortgage servicing activities, including those subject to and related to those disclosed in this action, have created a "heightened risk, including significant operational risk" and warrant Cenlar to be subject to the OCC Guidelines Establishing Heightened Standards.  *See* Ex. 3, OCC Letter to Cenlar.

10.     As a direct and proximate result of PRMG's and Cenlar's violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Ntam and the RESPA Class members have been proximately harmed by PRMG's and Cenlar's publishing of derogatory information to the credit reporting agencies subject to disputes regarding the borrower's payments and sums claimed due. They were not permitted as a matter of law to report such information but did so anyway in disregard of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).  These damages include statutory damages available pursuant to 12 U.S.C.A. § 2605(f) and non-economic credit damage by reporting negative information to others, including the credit reporting agencies, which PRMG and Cenlar were expressly prohibited from reporting and puts Ntam and the RESPA Class members in a false light in contravention of the law.

11.     As a further direct and proximate result of PRMG's violations of 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.35, Ntam has also been further damaged individually by PRMG's Cenlar's failure to correct their knowingly incorrect servicing records by performing a reasonable investigation of his QWR/NOE and the status of Ntam's mortgage loan.  PRMG's and Cenlar's failure to correct its errors and perform any reasonable investigation has caused Ntam economic and non-economic damages in form of lost payments received and realized by PRMG and its authorized agent(s), including Cenlar, which Ntam was not given credit for until long after this action commenced even though PRMG had received the payments when due and transmitted them to

Cenlar. PRMG's and Cenlar's failure to correct their errors has also resulted in emotional damages to Ntam manifested by anger, anxiety, frustration, and fear that PRMG intended for months to try to take his home based on false pretenses that he was in default on his loan obligation when he was not, which has put him in a false light to others and caused him to lose access to credit as described *infra*.

**JURISDICTION AND VENUE**

12.     This Court has Article III jurisdiction over the claims asserted herein (and detailed *infra*) since (i) Plaintiff and the putative class members he seeks to represent each have suffered injuries which are "concrete, particularized, and actual or imminent" (i.e., reputational harms by the disclosure of disputed, private information to others which puts Plaintiff and the putative class members in a false, negative light and is a traditional harm associated with the tort of defamation. Plaintiff's and the putative class members' particularized injuries also involves the misleading imposition and collection of late fees and other default charges not actually owed but which were actually demanded and/or collected by PRMG (and its authorized agent Cenlar) and the members of the Defendant Class in the one year before the filing of this pleading); (ii) the injuries were caused by PRMG and the members of the Defendant Class in delegation of their legal duties discussed herein to Cenlar whose acts and omissions impermissibly infected Plaintiff's and members of the RESPA Class and TILA Class contractual rights with  PRMG and the members of the Defendant Class; and (iii) the injuries would likely need to be redressed by judicial relief sought in this pleading since they have continued even after PRMG has engaged counsel paid for by Cenlar related to the issues presented in this matter.

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 since certain of the claims asserted herein arise under the laws of the United States.  The Court also has supplement jurisdiction over the other claims and damages asserted herein pursuant to 28 U.S.C. § 1367(a).

14.     Venue is proper in this Court as the acts and conduct alleged all occurred in the District of Columbia.

<u>**PARTIES**</u>

15.      Plaintiff Victor Ntam ("Ntam") is a natural person who owns and resides at the real property commonly known as 1021 51st Street, NE, Washington, DC  20019 ("Ntam Property").  Ntam has resided at the Ntam Property at all times relevant and material to this action as his personal residence.  The Ntam Property serves as Ntam's home and personal residence, as evidenced by Ntam's Affidavit of Occupancy executed by him on July 23, 2020 when he acquired the Ntam Property and borrowed the loan from PRMG subject to this action.

16.     Defendant PRMG is a collector and is a licensed mortgage servicer in the District of Columbia (NMLS Lic. No. MLB75243).  PRMG is also a California corporation, domiciled in California, with its principal place of business located in the City of Corona, Riverside County, California.  In addition:

a.     PRMG is a mortgage servicer as defined by 12 U.S.C.A. § 2605(h)(i)(2) and subject to the requirements and duties imposed by 12 U.S.C.A. § 2605 and its related regulations.

b.     PRMG is a furnisher of credit information to the credit reporting agencies as defined by 12 U.S.C.A. § 2605(e)(3), 12 C.F.R. § 1024.35(i)(1).  *See also Mohamed v. Select Portfolio Servicing, Inc.*, 215 F. Supp. 3d 85, 92 (D.D.C. 2016).

c.       In relation to the Plaintiff and certain of the TILA Class members, as defined *infra*, PRMG is a creditor as defined by 15 U.S.C.A. § 1602(g) since (i) it regularly extends consumer credit which is payable by written agreement in more than four installments and for which the payment of a finance charge is required, and (ii) it is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the loan documents evidencing the indebtedness.

d.       PRMG is the principal who has engaged Cenlar to act on its behalf, using PRMG's name, and with PRMG's authority in relation to the Plaintiff and the RESPA Class and certain of the TILA Class members.  PRMG and the members of Defendant Class have agreed to permit and expressly authorized Cenlar to act as their authorized vendor (while using their names) to partially service the Plaintiff's and TILA Class members' loans to perform a standard range of services for them including: payment processing, maintaining records of payments and balances, collecting and making disbursements for tax and insurance payments, sending monthly statements, etc.  However, neither PRMG nor the members of Defendant Class have notified the Plaintiff and members of the TILA Class that the servicing has been officially transferred to Cenlar pursuant to 12 U.S.C.A. § 2605(b)(c). PRMG and the members of Defendant Class remain the prime servicer in relation to the Plaintiff's loan and the loans of the RESPA Class and TILA Class members and Cenlar is simply an entity engaged by them to perform certain functions they are required to perform in relation to the Plaintiff and the members of the RESPA Class and TILA Class.

17.       Cenlar is a chartered federal saving bank which operates a niche business as a specialized vendor for hundreds of clients nationwide, including PRMG and members of the Defend-

ant Class, in relation to certain mortgage servicing functions including functions their responsibilities as the primary servicer of residential mortgage loans. Cenlar is a citizen of New Jersey. In addition:

a.      In relation to the Plaintiff and the RESPA Class and TILA Class members, Cenlar has no lawful or contractual relationships since it only works in the 'back of the house' (i.e. off the books) on behalf of PRMG and members of the Defendant Class and no notice of the actual transfer of servicing rights pursuant to 12 U.S.C.A. § 2605(b)(c) has occurred which identifies Cenlar as the servicer which then conceals its role from borrowers contrary to industry standards and customs of the remedial purposes of RESPA;

b.      Cenlar is simply a vendor engaged by and controlled by PRMG and the members of Defendant Class to act on their behalf pursuant to their contracts with Cenlar on a "Private Label" basis in relation to Plaintiff and the RESPA Class and TILA Class members, meaning generally that Cenlar was to use PRMG's name and the names of the members of the Defendant Class when servicing the loans;

c.      Cenlar is the source of the derogatory, negative information conveyed to the credit reporting agencies about the Plaintiff and members of the RESPA Class but falsely and deceptively reports the information in the names of PRMG and the members of the Defendant Class to further conceal its identity as the mortgage servicer assigned to collect upon the Plaintiff's loan and the loans of the RESPA Class.

d.      Upon information and belief based upon the statement of Cenlar's Vice President, Executive Client Management on June 7, 2021, Cenlar uses a sub-vendor, i.e. Regulus, to provide to it (and its "Private Label" clients including PRMG and the members of the Defendant Class) outsourced billing and payment services.  As discussed *herein*, Cenlar is aware that Regulus

does not promptly credit payments received by it while acting under Cenlar's control and as its authorized sub-agent/vendor with PRMG and the members of the Defendant Class.

e.    In relation to the Plaintiff and the RESPA Class members Cenlar is a furnisher of credit information to the credit reporting agencies as defined by 12 U.S.C.A. § 2605(e)(3), 12 C.F.R. § 1024.35(i)(1) and does so in the trade lines associated with the Plaintiff and the RESPA Class members identified in the name of PRMG and other members of the Defendant Class in relation to the Plaintiff's loan and the similar loans of the RESPA Class members.

18.    Unknown members of the Defendant Class are:

a.    Creditors as defined by 15 U.S.C.A. § 1602(g) since each (i) regularly extends consumer credit which is payable by written agreement in more than four installments and for which the payment of a finance charge is required, and (ii) are the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the loan documents evidencing the indebtedness.

b.    The principals who, like PRMG, have engaged Cenlar to act as their authorized vendor in relation to payment processing, maintaining records of payments and balances, collecting and making disbursements for tax and insurance payments, sending monthly statements, reporting credit information in their names to the credit reporting agencies as the source of the information (even though Cenlar is the true source), and investigating borrowers' requests to collect errors, qualified written requests, or notices or error,  etc. of residential mortgage loans similar to the Plaintiff's loan with PRMG.

c.    Easily identified by the business records of Cenlar, Regulus, and other third-party vendors used by Cenlar which are kept in the normal course of their business and which

include entries of the Loan records it performs work (e.g. mortgage payments) and notes for Loans of the Plaintiff and the TILA Class members.

19.    Not named as parties to this action are the credit reporting agencies known as Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("Trans Union"), and Experian Information Solutions, Inc. ("Experian")(collectively "CRAs").  Each of the CRAs have contracts with Cenlar, PRMG, and members of the Defendant Class which govern PRMG's, Cenlar's, and the members of the Defendant Class' relationship with each.  Generally, the standard terms and conditions of these contracts with the CRAs require PRMG, Cenlar, and the members of the Defendant Class to:

a.    Only use the data and services contracted for with each CRA as expressly authorized by the written contact;

b.    Comply with all laws and regulations, including RESPA, related to collection of and dissemination of borrower data obtained by Cenlar, PRMG, and members of the Defendant Class from the CRAs;

c.    Be solely responsible for reinvestigation and accuracy of any data transmitted to the CRAs (a non-delegable duty); and

d.    Supervise the work of any vendor or processor engaged by it, including Cenlar.

20.    Known members of the Defendant Class include AmeriHome Inc., FirstBank Mortgage, Texas Capital bank, LoanDepot, Homebridge Financial Services, CMG Mortgage Inc., and many credit unions.

21.     Not named as a party to this action is Crane Consulting & Outsourcing ("Crane"), who Cenlar outsources some of its contractual responsibilities on behalf of PRMG and other members of the Defendant Class, to conduct investigations of qualified written requests and notices of error subject to this action in relation to the RESPA Class.  Cenlar never disclosed to Crane's investigators that the OCC found that it was "engaging in unsafe or unsound practice(s), including those relating to the Bank's internal controls and operational risk management practices" as determined by the OCC.  Cenlar required Crane however to utilize its knowingly broken systems to respond to borrower QWRs/NOEs which simply further negatively, infected the problems created by its practices and disregarded its duties under RESPA since its investigators would never perform reasonable investigations issuing Cenlar's "unsafe and unsound" systems and data as part of their work.

## FACTUAL ALLEGATIONS

### Additional General Allegations About the Knowledge of Cenlar, PRMG, and Members of the Defendant Class

22.     All persons, including licensed mortgage lenders/servicers in the District of Columbia like PRMG, members of the Defendant Class, and federal savings banks like Cenlar, are expected to know the law.  As part of its license/registration to even conduct business in the District of Columbia PRMG "shall comply with applicable federal law and any rule, regulation, order, or interpretation promulgated or issued pursuant to the applicable federal law."  D.C. Mun. Regs. tit. 26-C, § 1122.  PRMG "shall [also] act in good faith in the best interest of the borrower."  D.C. Mun. Regs. tit. 26-C, § 1116.5.  Certain members of the Defendant Class also doing business in the District of Columbia also must comply with D.C. Mun. Regs. tit. 26-C, § 1122 and D.C. Mun. Regs. tit. 26-C, § 1116.5.

23.     Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), PRMG and the members of the Defendant Class have a duty to the Named Plaintiff and Class members to (i) take appropriate steps to avoid foreclosure as part of its standard servicer's duties and (ii) comply with any other obligation(s) found by the CFPB, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605.

24.     PRMG and Cenlar must also make prompt corrections in response to complaints asserted by a borrower.  12 C.F.R. § 1024.38.

25.     Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), PRMG and members of the Defendant Class are required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law."  Pursuant to 12 C.F.R. § 1024.35(b)(5), PRMG and members of the Defendant Class are not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower."  It is unreasonable and a violation of its duties for PRMG and members of the Defendant Class to demand payments and sums, fees and charges from borrowers that it is prohibited from imposing in the first instance by contract and by law.

26.     12 C.F.R. § 1024.35(i)(1) was promulgated by the CFPB in a Final Rule that became effective on January 10, 2014.  *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696-01.  In issuing its Final Rule the CFPB explained:

> Industry commenters strongly objected to the 60-day reporting prohibition. Commenters said the proposal undermines the accuracy and integrity of credit reports. One commenter said the Fair Credit Reporting Act already governs credit reporting. One large bank commenter asserted that because credit reporting is a safety and soundness protection, banks have a duty to accurately report delinquencies. Several industry commenters also noted a concern that, based on prior experience, borrowers may use the reporting prohibition to manipulate the system by disputing legitimate delinquencies in order to apply for credit without derogatory marks on credit

reports. The Bureau acknowledges the concerns expressed but notes that Congress specifically imposed the 60-day reporting prohibition with respect to qualified written requests in section 6(e) of RESPA. As discussed above, **the Bureau believes it is necessary to achieve the consumer protection purposes of RESPA, including to ensure responsiveness to borrower requests and complaints and the provision of accurate and relevant information to borrowers, to apply the same procedures to all notices of error as applicable to qualified written requests.** Otherwise, borrowers and servicers must expend wasteful resources parsing the form requirements applicable to qualified written requests and navigating between two separate regulatory regimes. As detailed above, the Bureau believes that the interests of borrowers and servicers are best served and the purposes of RESPA are best met through a single regulatory regime applicable to both qualified written requests and other notices of error. The Bureau is therefore adopting § 1024.35(i)(1) as proposed, as it is consistent with the 60-day reporting prohibition for qualified written requests required by section 6(e) of RESPA.

*Id.* at 10752 (emphasis added).

### *Factual Allegations About the Credit Reporting System*

27.     In July 2019 the CFPB issued a report, *Building a Bridge to Credit Visibility*, which

explained disputed credit reporting can have material impact on vulnerable consumers:

The ability to access credit is a critical component for families and individuals nationwide to have the opportunity to climb the economic ladder, exercise informed consumer choice, build wealth, and achieve economic stability. During this panel, a panelist representing UnidosUS, a Latino nonprofit organization, explained that access to credit can affect consumers' daily lives in many ways, and often means the difference between economic opportunity and fragility. According to this panelist, access to credit affects where consumers reside, work, and go to school; it may also have lasting generational effects.

*Id.* at Page 7.

28.     Previously the Board of Governors of the Federal Reserve System's 2007 "Report

to Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit"

explained:

Inaccurate data may cause some consumers to pay more, or less, for credit than is warranted by their true circumstances. For the full benefits of the credit-reporting system to be realized, credit records must be reasonably complete and accurate. Yet, under the country's voluntary system of credit reporting, complete information is not always reported to the credit-reporting system. Moreover, data accuracy is an

issue under any credit-reporting system. The accuracy of the data affects both credit scoring and judgmental evaluations because both techniques rely on the quality of the information included in credit reports. Judgmental underwriting, which requires a loan officer's individual attention to an application, provides an opportunity to identify inaccuracies that credit scoring does not.

*Id.* at Page 17.

29.    To help address and avoid the specific, negative consequences of continued, negative reporting by mortgage services (similar to those described in the preceding paragraphs) that are subject to borrower QWR/NOEs, Congress and the CFPB enacted a specific tool in the toolbox of rights and remedies in favor of borrowers—i.e., 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1). In plain language the CFPB explains the protection to the Plaintiffs and Class members as follows on its website:

> Q. Can my mortgage servicer report negative information about me to a credit-reporting agency after I have sent an error dispute or information request?
>
>> A. It depends. If your notice of error is in regards to a payment, your servicer can't provide negative information about that payment to any consumer reporting agency or credit bureau for the 60 days after it receives your notice of error.

https://www.consumerfinance.gov/ask-cfpb/can-my-mortgage-servicer-report-negative-information-about-me-to-a-credit-reporting-agency-after-i-have-sent-an-error-dispute-or-information-request-en-209/ (last visited April 7, 2022).

***Factual Allegations About the Pattern and Practice of Cenlar's Failure to Comply with Federal Laws and Regulations While working as a Vendor on a "Private Label" Basis***

30.    In addition to Plaintiff's experiences described *infra*, Cenlar has engaged in a pattern and practice of errors, misrepresentations, and failures to comply with basic fundamental functions while acting as a mortgage servicing vendor on a "private label" basis.    For example:

a.      In litigation pending in the United States District Court for the Middle District of Louisiana (Case No. 3:18-cv-00582), it has been disclosed that Cenlar (i) failed to adequately communicate with multiple borrowers concerning damage and insurance claims that "exposed" Cenlar's private label client to "penalties" under Federal laws, including RESPA and its regulation, by misrepresenting the terms of forbearance agreements, dual tracking borrowers to foreclosure while in loss mitigation, failing to timely respond to borrowers qualified written requests and error resolution notices, assessment of improper law fees, and failure to suppress credit reporting.  *See* Supplemental and Amended Complaint, *GMFS, LLC v. Cenlar FSB* (Doc. 84).

b.      In a pending matter between a residential borrower from the State of Maine, i.e., William Morgan (property address 8 Old Orchard Road, 04064), and Cenlar's private label client CMG Financial, Cenlar has infected Mr. Morgan's rights and protections through a pattern and practice of: (i) sending backdated mail to Mr. Morgan to give it the appearance of timely responding to his qualified written requests and notices of error (eleven instances over 12 months) when in fact it has not done so; (ii) failing to acknowledge certain qualified written requests and notices of error (2-3 instances) as required by RESPA; and (iii) failing to completely respond to certain qualified written requests and notices of error as required by RESPA (11 over 12 months).

c.      In a pending matter between a residential borrower from the State of Maine, i.e. William Morgan (property address 8 Old Orchard Road, 04064), and Cenlar's private label client CMG Financial, Cenlar has infected borrower's rights and protections by failing to promptly posting his payment(s) to his account (i.e., payment received on June 1, 2021) as required by TILA and thereafter falsely claimed the borrower was overdue on his payment and did not post it with an effective date that the payment was received.

d.    In a pending matter between a residential borrower in Arizona, George Cutlet (property address 6652 E. Virginia Street, Mesa, AZ 85215), Cenlar on behalf of PRMG failed to take prompt action to correct errors identified by the borrowers and also reported negative, derogatory information related to that failure to take prompt action to the credit reporting agencies in PRMG's name and concealing itself as the source of the information in violation of Federal law.

e.    In litigation pending in the United States district Court for the Eastern District of Pennsylvania (Case No. 2:21-cv-05381-NIQA), Cenlar became the undisclosed mortgage service of the borrower's loan and immediately began to attempt to demand and collect sums from the borrower which were not owed including, like Ntam here, late fees and threats of foreclosure. Cenlar, using the name of another member of the Defendant's Class here, admitted to that borrower that his loan was "incorrectly boarded into [its] system upon acquisition, as well as corrections to the applications of [his] payments." In litigation pending in the Circuit Court for Baltimore County, Maryland (Case No. C-03-cv-20-003237), Cenlar acting on behalf of another member of the Defendant Class responded to a borrower's QWR/NOE in backdated correspondence and failed to make a reasonable investigation into the borrower's disputed about its unfair forced placed insurance practices, claimed inaccurate sums were due on the loan, and claimed a right to impose and collect fees barred by law and the loan documents.  In addition, Cenlar violated RESPA in relation to that borrower by failing to pay the property insurance premium when it was due, failing to promptly correct its errors when notified by the borrower, and force placing Cenlar's chosen insurance when it had no reasonable right to do so.

31.    PRMG and the members of the Defendant Class are aware of this pattern and practice of Cenlar described in ¶ 30(a)-(f) and its unsafe and unsound business practices as determined by the OCC because Cenlar disclosed the OCC Consent Order with representatives of hundreds of

its clients in mass conference calls or meetings in the Fall of 2021 after this action commenced. In the alternative, PRMG and the members of the Defendant Class have recklessly disregarded notice of Cenlar's mistakes, misrepresentations, and unsafe and unsound conduct and have ratified Cenlar's conduct as their own and therefore is lawfully responsible for the damages and losses directly or indirectly caused by Cenlar subject to this action in their names.

32.    PRMG and, upon information and belief other members of the Defendant Class, do receive payments made directly to them by borrowers just like Ntam and other members of the Defendant Class.  When they receive the payments they are forwarded to Cenlar.  In addition, PRMG has a matter of practice and custom provided Cenlar a spreadsheet of these payments to track them and ensure borrowers are given proper credit.  However, Cenlar's private label, secret servicing system is not able to properly credit such payments in light of its "unsafe and unsound" systems which leads to payments not being given prompt credit—just like what happened to Ntam as discussed *infra*.

### *Factual Allegations Relevant to Named Plaintiff*

33.    On or about July 23, 2020, Ntam acquired the Ntam Property by Deed.

34.    To acquire the Ntam Property for his intended personal use, Ntam borrowed the sum of $438,866 from PRMG in terms described and agreed in a Note ("Ntam Loan").  The Ntam Loan provided for monthly, periodic payments "beginning on September 1, 2020."  The Ntam Loan terms also provided a 15 calendar day grace period before any late charge would be imposed on the loan.

35.    PRMG is the named lender in the Ntam Loan documents (i.e. Note and Deed of Trust).

36.     The Ntam Loan was intended at the time of the application and agreement between Ntam and PRMG to be for consumer, non-commercial purposes—i.e. his home.  Ntam intended initially to make improvements to the Ntam Property and was planning to do that and also from time to time he has considered potentially renting portions of the Ntam Property while residing there and working on it himself.  However, given the nature of his improvement plans he elected not to pursue renting rooms.  Then, when PRMG and Cenlar began destroying his credit, Ntam put all plans on hold because he knew he could not obtain improvement financing while his credit was wrongfully destroyed based on false information furnished by PRMG (who, thanks to discovery he now knows was actually provided by Cenlar because it concealed itself as  the source of the data transmitted by it to the CRAs).   In sum, Cenlar's and PRMG's conduct (which has continued in this litigation for the apparent purpose of harassing him to escape responsibility for their actions) has put any plans for Ntam to improve the property on hold but he continues to make his monthly payments on the Ntam Loan.

37.      Ntam never received any notices from PRMG or Cenlar notifying him of the actual transfer of servicing rights pursuant to 12 U.S.C.A. § 2605(b)(c) related to the Ntam Loan.  Only after this action commenced did he receive an email from Cenlar using PRMG's name requesting he make his payments to PRMG at an address in New Jersey.

38.     As part of the terms and conditions related to the Ntam Loan, PRMG is required to send to Ntam monthly, periodic statements about the Ntam Loan.   From September 2020 through December 3, 2020, PRMG claims to have sent Ntam periodic statements about the Ntam Loan, but for reasons unknown to Mr. Ntam, he never received those statements and according to Cenlar's business records they were returned to Cenlar. In November 2020, Ntam spoke to a PRMG employee who represented that the statements and correspondence issued related to the loan had

been returned to PRMG.  Upon information and belief that individual who claimed to have worked

for PRMG actually worked for Cenlar.

39.    Ntam has made all the requirement payments on the Ntam Loan during or before

the grace period established in the loan documents.  A summary of these payments through August

2021 is as follows:

| SUMMARY OF PAYMENTS ON THE NTAM LOAN | | | | |
|---|---|---|---|---|
| MONTHLY PAY-MENT | CHECK NUMBER | PAYMENT AMOUNT | DATE PAYMENT CLEARED NTAM ACCOUNT | DATE PRMG APPLIED THE PAYMENT |
| September 2020 | 1372 | $2,784.78 | September 9, 2020 | Sept. 3, 2020 |
| October 2020 | 1395 | $2,784.78 | October 8, 2020 | Oct. 5, 2020 |
| November 2020 | 1415 | $2,784.78 | November 17, 2020 | |
| December 2020 | 995001 | $2,784.78 | December 7, 2020 | Dec. 2, 2020 |
| January 2021 | 995002 | $2,784.78 | January 14, 2021 | Jan. 7, 2021 |
| February 2021 | 995003 | $2,784.78 | February 17, 2021 | Feb. 10, 2021 |
| March 2021 | 995004 | $2,784.78 | March 15, 2021 | Mar. 10, 2021 |
| April 2021 | 995005 | $2,784.78 | April 12, 2021 | April 7, 2021 |
| May 2021 | 995006 | $2,784.78 | May 13, 2021 | May 6, 2021 |
| June 2021 | 995007 | $2,784.78 | June 11, 2021 | June 14, 2021 |
| July 2021 | 995008 | $2,784.78 | July 2, 2021 | Returned by Cenlar |
| August 2021 | 995009 | $2,784.78 | August 4, 2021 | August 4, 2021 |

40.    According to some of the payments identified in the preceding paragraph, PRMG

outsources some of its collection services to Cenlar to process payments received on its behalf.

Upon information and belief based on this fact, Plaintiff believes Cenlar is PRMG's authorized

agent and vendor it retained, without Ntam's consent, to process payments from borrowers like

Ntam.  PRMG is solely responsible for the acts and omissions of its agent(s), subagent(s), and

vendors including Cenlar when Cenlar acts on its behalf to collect and process payments.   Based

upon these facts and Cenlar's standard and uniform contract for providing "private label" servicing

to other mortgage actors (as described in ¶¶ 17.b, 30), upon information and belief PRMG has a

similar contractual relationship with Cenlar.

41.    Ntam has no contractual relationships with Cenlar.  Nor does Cenlar have any right to report or communicate any credit information to any CRA related to Ntam since he has not applied to it for credit, agreed to any credit relationship with it, or engaged it for any credit related services.  Finally, Cenlar has no right to conceal itself as the source of credit information reported by it to the credit reporting agencies while using PRMG's name and the names of the members of the Defendant Class since the CRAs are required by law to accurately report the source of the credit information they report about consumers.

42.    Even through PRMG received Ntam's timely payment for November 2020 (Check No. 1415) and endorsed it with its own bank stamp and deposited the payment into its account at Wells Fargo Bank, NA, PRMG did not promptly give Ntam credit for the payment and instead imposed, charged, and/or collected a late fee onto his mortgage account which was not due and owing under his loan terms. To cure the error it recognized by December 21, 2020, PRMG called Cenlar and requested it to correct its records to correct the mistake.  Cenlar represented to PRMG that it would "absolutely" correct the issue but instead recklessly chose not to do so (until long after this action was commenced).

43.    Notwithstanding Ntam has timely made each of the payments due on the Ntam Loan within the loan's grace period before the commencement of this action, Cenlar using PRMG's name falsely reported to the credit reporting agencies that he has not and is otherwise delinquent.  For example, as of January 14, 2021, Cenlar using PRMG's name had reported to the CRAs that Ntam was late 30 days when he in fact was not late and Cenlar knew the true facts since at least December 21, 2020.  This derogatory, false reporting put Ntam in a negative light and dropped his credit scores to a rage of 572 (as of January 14, 2021).

44.    Notwithstanding that Ntam has timely made each of the payments due on the Ntam Loan within the loan's grace period and as of December both knew that fact to be true according to their own business records, Cenlar and PRMG has threatened Ntam with other written, derogatory actions including:

a.    On January 11, 2021, Cenlar and PRMG claimed Ntam was in default and threatened him with potential foreclosure even though he was current on the Ntam Loan.

b.    On January 11, 2021, Cenlar PRMG again claimed Ntam was in default and threatened him with potential foreclosure even though he was current on the Ntam Loan.

c.    On January 19, 2021, Cenlar and PRMG threatened Ntam as being delinquent and imposed late charges of $100.07 even though he was current on the Ntam Loan.

d.    On February 1, 2021, Cenlar and PRMG claimed Ntam was in default and threatened him with potential foreclosure even though he was current on the Ntam Loan. They also demanded that he pay $5,669.63 in sums that he had already paid to it.

e.    On February 17, 2021, Cenlar and PRMG threatened Ntam as being delinquent and imposed late charges of $200.14 even though he was current on the Ntam Loan.

f.    On February 18, 2021, Cenlar and PRMG threatened Ntam as being delinquent and imposed late charges of $200.14 even though he was current on the Ntam Loan.

g.    On April 1, 2021, Cenlar and PRMG threatened Ntam as being delinquent and imposed late charges of $300.21 even though he was current on the Ntam Loan.

h.    On April 19, 2021, Cenlar and PRMG again threatened Ntam as being delinquent and imposed late charges of $300.21 even though he was current on the Ntam Loan.

        i.      On April 6, 2021, Cenlar and PRMG provided Ntam an inaccurate payoff statement which claimed he was late on his payments and owed it late fees they were not entitled to recover.

        j.      On May 3, 2021, Cenlar and PRMG threatened Ntam as being in default and demanded he pay it $5,869.77 in sums he had already paid.

        k.      On May 18, 2021, Cenlar and PRMG threatened Ntam as being delinquent and imposed late charges of $400.28 even though he was current on the Ntam Loan.

        l.      On June 1, 2021, Cenlar and PRMG threatened Ntam as being in default and demanded he pay it $5,969.84 in sums he had already paid.

        m.      On July 19, 2021, Cenlar and PRMG threatened Ntam as being delinquent and imposed total late charges of $500.35 even though he had made all payments on the Ntam Loan, and the July 2021 payment was only missed due to Cenlar's voluntary return of Ntam's timely payment for no just basis.

45.    Because of the problems with mail delivery to the Ntam Property by the United States Postal Service as described in ¶ 38, Ntam utilized his mother's address as the designated mailing address for PRMG and informed it of his decision in this regard. In the correspondence identified in ¶ 44, Cenlar and PRMG utilized that mailing address in its correspondence to Ntam. So, when PRMG and Cenlar intends to communicate with Ntam by mail, they are aware and know the proper mailing address to use.

46.    In its prior correspondence to him, Ntam was routinely invited by Cenlar and PRMG to write to PRMG and notify them of any error(s)(Cenlar did not identify itself in this correspondence but it is now confirmed that Cenlar controlled this address to use on behalf of PRMG and its other clients who are members of the Defendant Class). In correspondence dated

on or about February 11, 2021, Ntam wrote to PRMG/Cenlar at the address published for such

qualified written requests, notices of error, and requests for information pursuant to 12 U.S.C.A.

§ 2605 and its implementing regulations ("Ntam QWE/NOE/RFI").  Cenlar and PRMG received

the Ntam QWE/NOE/RFI correspondence at that designated address on February 19, 2021 but did

not substantively respond thereafter.

47.    In the Ntam QWE/NOE/RFI, Ntam notified PRMG and Cenlar of the following

errors:

a.    The failure to send him each of his periodic, monthly statements.

b.    The failure to investigate the hours of phone calls he had previously made

to dispute PRMG's false, negative credit reporting and accounting of the Ntam Loan.

c.    The failure to give him credit for his November 2020 monthly payment

which infected his subsequent payments and led to the improper assessment of late fees.  Ntam's

QWE/NOE/RFI included evidence of his disputed payments that he was not getting credit for

having made (i.e., copies of the checks and other evidence).

d.    The failure to properly report his payments to the credit reporting agencies

and election instead to report him as late.

48.    In the Ntam QWE/NOE/RFI, Ntam also requested the following actions:

a.    To correct its serving, accounting, and collection errors.

b.    To "delete or suppress all information furnished to any credit reporting

agency concerning any payment claimed to be due on or after November 1, 2020 for at least sixty

days after the receipt of [the Ntam QWE/NOE/RFI]."

c.    Provide him an accounting of the Ntam Loan, copies of all documents re-

viewed to respond to the Ntam QWE/NOE/RFI, and a payoff quote.

49.     Cenlar/PRMG acknowledged receipt of Ntam's QWR/NOE/RFI by letter dated February 22, 2021, in which represented that a dull response would occur within 30 business days. Cenlar/PRMG later sent another correspondence dated March 24, 2021, in which the letter represented that Cenlar/PRMG needed 15 additional business days to complete its research (or by April 23, 2021). However, Cenlar/PRMG never sent Ntam any further response (substantive or otherwise). Even after Cenlar/PRMG has engaged counsel within days of the commencement of this action (i.e. June 15, 2021), Cenlar/PRMG continued to not provide any response to Ntam's QWR/NOE/RFI and therefore never conducted any reasonable investigation into it. This conclusion is based on the fact that Cenlar/PRMG has never substantively responded to Ntam.

50.     Only in discovery more than ten months later did Cenlar/PRMG produce a purported letter claiming to be a response to Ntam's QWR/NOE/RFI but the only individual at PRMG with any knowledge about the facts at issue in this matter, i.e. Christy Christiansen, confirmed under oath that Cenlar/PRMG's record system does not show that the purported Cenlar/PRMG response to Ntam's QWR/NOE/RFI was ever mailed (but the same records do show other correspondence was mailed to Ntam).

51.     The fake response produced by Cenlar/PRMG in discovery never mailed to Ntam also demonstrates on its face that Cenlar/PRMG did not perform any reasonable investigation into to Ntam's QWR/NOE/RFI. This conclusion is shown by:

      a.     The fake correspondence's claim that the November 2020 check received by Cenlar and PRMG did not contain a loan number when it did.

      b.     The fake correspondence's claim that the November 2020 check was made through "a third-party bill pay service" when in fact it was an old-fashioned hand-written check.

c.    The fake correspondence's claim that PRMG and Cenlar did not have any records of having received the check when (i) discovery has revealed audio calls between Cenlar and PRMG confirming receipt of the check, and (ii) the November 2020 check was not made through "a third party bill pay service" when in fact it was an old-fashioned hand-written check.

d.    The testimony of the purported investigator, Jennifer Vaden, that she only relied upon Cenlar's data systems for her investigation and no one had informed her that the OCC had found those records to be inherently unreliable and prone to systemic errors.

52.    In response to Ntam's QWR/NOE notice of error that Cenlar/PRMG received on February 19, 2021, as part of its consistent apparent policy, practice and pattern:

a.    Cenlar/PRMG did not correct its errors related to Ntam's mortgage account and continued to claim he owed sums which he did not owe;

b.    Cenlar/PRMG did not suppress the negative credit reporting information that was in dispute as was required pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1);

c.    Cenlar/PRMG did not conduct a reasonable investigation into Ntam's inquiry whatsoever and neither responded to Ntam except to acknowledge to him in written correspondence dated February 22, 2021 that they received the QWR/NOE and would "promptly review [the] inquiry, complete research, and respond within 30 business days"; and

d.    Notwithstanding its written promises in its February 22, 2021 acknowledgement correspondence, Cenlar/PRMG did not promptly review Ntam's inquiry, complete any research, or respond within 30 business days and instead ignored Ntam's

QWR/NOE and continued its incorrect, false, and negative servicing of Ntam's personal mortgage loan.

53.    Cenlar/PRMG did not perform a reasonable investigation in response to its receipt of the Ntam QWE/NOE/RFI.  This conclusion is based in part on the following:

a.    Cenlar/PRMG never substantively responded to the Ntam QWE/NOE/RFI except to (i) acknowledge its receipt and notify him of its need for an extension of time to respond and (ii) to provide an inaccurate payoff statement (which itself is a violation of 15 U.S.C.A. § 1639g and 12 C.F.R. § 1026.36(c)(3));

b.    No substantive responses were ever made by Defendants even after each engaged counsel until ten months after the fact when Cenlar/PRMG chose to finally produce discovery of the fake response.

c.    Cenlar/PRMG did not suppress and cease any of the derogatory and disputed credit reporting in the sixty day period following its receipt of the Ntam QWE/NOE/RFI. This fact is based in part upon: (i) a credit report related to Ntam dated April 8, 2021 by Experian in which Cenlar in the name of PRMG reported (as of March 2021) Ntam as delinquent on his loan for January and February 2021 which were periods of time subject to PRMG's errors on the Ntam QWE/NOE/RFI; and (ii) a credit report related to Ntam dated June 2, 2021 by TransUnion in which Cenlar in the name of PRMG reported (as of April 12, 2021) Ntam as delinquent on his loan for January and February 2021 which were periods of time subject to Cenlar/PRMG's errors on the Ntam QWE/NOE/RFI.

d.    Cenlar/PRMG did not dispute Ntam's evidence of payments whatsoever.

     e.     Cenlar/PRMG did not contact Ntam or his bank to inquire about the evidence he provided them concerning the payments he was not getting credit for, but they had received.

     f.     Cenlar/PRMG never sought Ntam's consent to speak to any third party to verify the specific errors he identified, which they would necessarily have done if they actually conducted any reasonable investigation (and he would have so consented if ever asked).

54.     As a direct and proximate result of Cenlar/PRMG's negative and derogatory information reported to the CRAs and also in violation of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Ntam's creditor Guitar Center/Synchrony Bank (acct. number ending in 0692) closed his account in April 2021 based upon the "Delinquent Or Derogatory Real Estate Secured Loan."  In addition, subsequent to the commencement of this action Ntam's other creditor Luxury/Synchrony Bank (acct. number ending in 6962) also closed his account on July 21, 2021 based upon the "Delinquent Or Derogatory Real Estate Secured Loan."

55.     As demonstrated by the well pled facts described herein, in violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Cenlar/PRMG furnished, directly or indirectly, adverse information to the credit reporting agencies known as TransUnion, Equifax, and Experian regarding payments subject to Ntam QWE/NOE/RFI.  Cenlar using PRMG's name furnished this adverse information from February 19, 2021 through April 20, 2021 (which were within sixty days of PRMG's receipt of the Ntam QWE/NOE/RFI).   *See also* ¶ 53(c) *supra*.

56.     It is plain legal error for PRMG to disregard its duties under RESPA, i.e., 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

57.    PRMG learned of the commencement of this action upon its public filing on or after June 10, 2021.  This belief is based upon the fact that its counsel contacted Plaintiff's counsel about this action before service had even been completed on June 15, 2021.

58.    On the same day this action commenced, PRMG's Alexandra Silva emailed the Plaintiff (on June 10, 2021 at 3:01PM) and requested he send all future payments to PRMG at the following address:

Payment Address:
Paramount Residential Mortgage Group, Inc.
Attn: Payment Processing,
P.O. Box 11733
Newark, NJ 07101-4733

59.    Silva's email communication described in the previous paragraph had the subject of the email identified as "Notice of Mortgage Loan Transfer."   Yet, the contents of the email communication did not comply with 12 U.S.C.A. § 2605(b).  Before this communication, PRMG had not sent the Plaintiff important loan information by electronic email. Upon information and belief, the address provided by Silva is an address controlled directly or indirectly by Cenlar while acting on behalf of PRMG and other members of the Defendant Class.

60.     In reliance on the email communication from Silva identified in the prior para-graphs, Ntam updated the address for PRMG's with his bank's bill pay system (which he began using in December 2020 after the November 1, 2020 check fiasco) to ensure his subsequent pay-ments would be delivered as instructed by Cenlar/PRMG.  In addition, as a courtesy, Ntam's coun-sel informed Cenlar/PRMG's counsel of the unusual communication on June 15, 2021 and Cen-lar/PRMG's counsel never disclosed the communication was in error or that Ntam should not fol-low its instructions.

61.    After engaging counsel related to this action, Cenlar/PRMG also continued and expanded its unfair and deceptive practices including as follows:

a.    PRMG did not promptly credit Ntam's timely July 2021 payment to it and instead the funds were returned to Ntam's account by Cenlar/PRMG and provided no basis for its refusal to accept the payments (Cenlar reversed the payment itself as PRMG's agent on July 9, 2021 after initially accepting it).

b.    Cenlar/PRMG continued its negative and false credit reporting which caused Ntam's creditor Luxury/Synchrony Bank (acct. number ending in 6962) to close his account based upon the "Delinquent Or Derogatory Real Estate Secured Loan" reported by PRMG to the CRAs.

c.    Cenlar/PRMG wrote to Ntam on July 19, 2021 in two separate correspondence communications and falsely claimed that Ntam still owed his July 2021 payment and threatened him with additional late fees and "other fees and charges [claimed] to be due on the loan." when in fact PRMG had received the payment but returned the funds through its agent Cenlar for unknown reasons and PRMG did not promptly give Ntam credit for the payment.

d.    Cenlar/PRMG wrote to Ntam on August 2, 2021 and falsely claimed Ntam had made a recent inquiry to them and they would respond within thirty days.  In fact, the only inquiry that remained outstanding with PRMG was its long overdue response to the Ntam QWE/NOE/RFI.

62.    Ntam has been further harmed as a result of Cenlar/PRMG's acts and omissions described herein and that harm includes economic and non-economic damages in the form of emotional distress damages manifested by frustration, fear, mental distress, anxiety, and worry. Ntam's anxiety, mental distress and worry has been demonstrated by his loss of appetite, difficulty

sleeping, weight loss, preoccupation with PRMG and distraction from work. More specifically he reasonably feared PRMG's continued reporting, which it did not cease directly or indirectly through Cenlar who used PRMG's name to report to the credit reporting agencies for the sixty days following receipt of the Ntam QWE/NOE/RFI, would negatively impact his continued business which relies upon his personal credit and his standing in the community. Ntam also reasonably feared, due to Cenlar/PRMG's constant threats of foreclosure (which have continued and even escalated after Cenlar/PRMG has engaged counsel), that he might arrive at the Property one day only to find that PRMG had initiated foreclosure proceedings against it. Ntam is also entitled to certain statutory damages under the claims asserted herein in addition to his actual damages and losses.

## CLASS ACTION ALLEGATIONS AS TO THE PLAINTIFF CLASSES (LCvR 23.1(a)(1))

63.    The Named Plaintiff bring certain claims, *infra*, on behalf of two classes of similarly situated persons under Fed.R.Civ.P. 23.  The Plaintiff proposes, that these classes be defined as follows:

a.    **RESPA Class:** All residential, mortgage loan borrowers for whom Cenlar acting on behalf of PRMG and other members of the Defendant Class received a QWR/NOE since June 10, 2018 pursuant to 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41.  Excluded from the RESPA Class are any borrowers who obtained a discharge under Chapter 7 of the Bankruptcy Code after the date Cenlar received their QWR/NOE.

b.    **TILA Class**:   All residential, mortgage loan borrowers from whom Cenlar provided "private label" servicing,[3] which included the acceptance and crediting of monthly, mortgage payments in the name of the Defendant Class Members in the twelve months preceding the

---

[3]    The term "private label" servicing is defined *supra*.  *See also* ¶¶ 17.b, 30.

filing of this pleading who: (i) each regularly extends consumer credit which is payable by written agreement in more than four installments and for which the payment of a finance charge is required, and (ii) is the person to whom the debt arising from the consumer borrower is initially payable on the face of the loan documents evidencing the indebtedness.  Excluded from the TILA Class are any borrowers who obtained a discharge under Chapter 7 of the Bankruptcy Code after the date PRMG or a member of the Defendant Class did not promptly credit their payment.

64.    In the alternative to the proposed TILA Class, Ntam also seeks, if necessary or appropriate, that a Fed.R.Civ.P. 23 sub-class be established related to each member of the Defendant's Class and the qualifying members of the TILA Class related to that Defendant Class member. In addition, the RESPA Class and TILA Class definitions in ¶ 63 may be amended or modified based on the course of discovery as this matter proceeds.

65.    Ntam is the proposed Named Plaintiff for the RESPA Class and TILA Class and qualifies as a member of the RESPA Class and TILA Class.

66.    This action may be maintained as a class action pursuant to Fed.R.Civ.P. 23(b)(3) since the claims involved herein are remedial and individuals are less likely to pursue these claims on an individual basis and a class action would be superior to having multiple, similar methods for fairly and adjudicating the controversy.  In addition, the Named Plaintiff brings certain of his RESPA Class claims solely upon the basis of Fed.R.Civ.P. 23(c)(4) to determine certain issues on a class-wide basis including: The issue of PRMG's liability for actual damages to the RESPA Class members under RESPA (to which they can proceed and pursue in separate individual actions).  By addressing the issue of liability of Cenlar and PRMG related to identical legal claims and leaving to the class members to prove their individual damages and losses in separate actions,

if they so choose, this will also efficiently manage the controversy on an issue (i.e. liability) that can be addressed at one time and in one forum.  LCvR 23.1(a)(2)(i); LCvR 23.1(a)(2)(iv).

67.    The particular members of the RESPA Class and TILA Class are capable of being described without difficult managerial or administrative problems.  The members of the RESPA Class and TILA Class are also readily identifiable from the information and records in the possession or control of Cenlar, PRMG, and members of the Defendant Class or their affiliates and agents and from public records.  PRMG, Cenlar, and members of the Defendant Class are required under Federal laws to maintain this information for the entire class periods.  *See* e.g. 12 C.F.R. § 1024.38(c).  LCvR 23.1(a)(2)(iv).

68.    The RESPA Class and TILA Class RESPA Class members are sufficiently numerous, exceeding more than fifty persons, such that individual joinder of all members is impractical. This allegation is based on a data search of public records which identify that hundreds of public complaints have been filed against PRMG and Cenlar related to the Defendant Class members, and Cenlar's admissions that it services thousands of residential, mortgage loans throughout the United States in a similar manner as the Plaintiff's loan and as a matter of public records—including PACER records which identify bankruptcy cases.

69.    There are questions of law and fact common to the RESPA Class and TILA Class RESPA Class which predominate over any questions affecting only individual members of the RESPA Class and TILA Class respectfully, in fact, the wrongs alleged against Cenlar and PRMG and the Defendant Class by the RESPA Class and TILA Class members and the remedies sought by Named Plaintiff and the RESPA Class and TILA Class RESPA Class against Cenlar and PRMG and Defendant Class are identical.  LCvR 23.1(a)(2)(iv).

70.     The common questions of law and fact for the RESPA Class members include but are not limited to (LCvR 23.1(a)(2)(iii)):

a.      whether Cenlar and PRMG has a legal duty to request the consumer reporting agencies to not report derogatory credit reporting information about the Named Plaintiff and RESPA Class members pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1);

b.      whether Cenlar and PRMG has a duty to furnish any information about the Named Plaintiffs and RESPA Class members to the credit reporting agencies upon receipt of their QWR/NOEs;

c.      whether Cenlar and PRMG's policy, practice, and/or procedure governing the suppression of disputed credit information in relation to the Named Plaintiff's and the RESPA Class members' QWR/NOEs complies with its statutory duties (that are also incorporated into the contracts between it and the Plaintiff and RESPA Class members) stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1); and

d.      whether Cenlar and PRMG's conduct fits a pattern and practice of 12 U.S.C.A. § 2605 violations (including violations of RESPA's implementing regulations).

71.     The common questions of law are fact for the TILA Class members include but are not limited to (LCvR 23.1(a)(2)(iii)):

a.      Whether PRMG and the Defendant Class members' practice of not promptly crediting payments by the TILA Class members is inconsistent with Regulation Z and the Official Interpretations;

b.    Whether PRMG and the Defendant Class members are entitled to impose, threaten, and/or collect late or other default fees from the TILA Class members when their authorized agent Cenlar does not promptly credit the TILA Class Members' payment and whether such fees are actual damages under TILA;

c.    Whether PRMG and the Defendant Class members are entitled to threaten the TILA Class members with default claims and late and default fees when their authorized agent Cenlar does not promptly credit the TILA Class Members' payments;

d.    What is the net worth of PRMG and each member of the Defendant Class for the purposes of statutory damages available pursuant to TILA for the TILA Class members (on a class-wide or sub-class wide basis); and

e.    Whether PRMG and the Defendant Class members' policy and/or practice of engaging a vendor to perform its duties under TILA and Regulation Z to promptly process payments absolves them of their duties under TILA and Regulation Z.

72.    PRMG's and the Defendant Class members' defenses (which defenses are denied) would be typical or identical for each of the member of the RESPA Class and TILA Class and will be based on the same legal and factual theories.  LCvR 23.1(a)(2)(iv).

73.    Certification of the RESPA Class and TILA Class under Fed.R.Civ.P. 23 is appropriate as to the members of the RESPA Class and TILA Class because common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.  LCvR 23.1(a)(2)(iv).

74.    A class action will cause an orderly and expeditious administration of claims by the members of the RESPA Class and TILA Class and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured. LCvR 23.1(a)(2)(iv).

75.    The only individual questions concern the identification of members of the RESPA Class and TILA Class.  This information can be determined by a ministerial examination of public records or from the Defendant's business records, the business records of the Defendant Class, Cenlar's and the CRAs' business records, or other sources, which are admissible as an exception to the hearsay rule and as a statement by a party.  Named Plaintiff does propose pursuant to Fed.R.Civ.P. 23(c)(4) for the Court to determine PRMG's liability for actual damages to the RESPA Class members so they may pursue those individual damages in separate actions as necessary or appropriate based on their individual circumstances.  LCvR 23.1(a)(2)(iv).

76.    The Named Plaintiff's claims are typical of the claims of the RESPA Class and TILA Class members pursuant to Fed.R.Civ.P. 23 since they are based on and arise out of identical facts constituting the wrongful conduct of the Defendant and the Defendant Class members.

77.    Ntam will also fairly and adequately represent and protect the interests of the RESPA Class and TILA Class.  He is similarly situated with and has suffered similar injuries as the RESPA Class and TILA Class RESPA Class he seeks to represent. He has also retained counsel experienced in consumer class actions including actions involving unlawful collection and mortgage servicing practices.  Ntam does not have any interests which might cause him not to vigorously prosecute this action or are otherwise adverse to the interests of the members of the RESPA Class and TILA Class. He feels he and the RESPA Class and TILA Class RESPA Class members have been wronged, wishes to obtain redress of the wrong, and wants the Defendant and Defendant Class members stopped from failing to comply with its mandatory duties stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).  LCvR 23.1(a)(2)(ii).

78.    The RESPA Class members have suffered actual damages, losses, and harm similar those sustained by Ntam described above.  Ntam does seek an award of statutory damages on

behalf of the RESPA Class as well as his own individual, actual damages under the claims asserted herein.  Ntam also seeks a determination of liability in favor of the RESPA Class members as to their individual, actual damages which can be pursued by the RESPA Class members on an individual basis in separate actions.  LCvR 23.1(a)(2)(iv).

79.     The TILA Class members have suffered actual damages, losses, and harm similar those sustained by Ntam described above.  Ntam does seek an award of statutory damages on behalf of the TILA Class as well as the actual damages of late and other default fees imposed and/or collected by Cenlar on behalf of PRMG and the Defendant Class members as a result of the failure to promptly credit payments from the TILA Class members.  LCvR 23.1(a)(2)(iv).

## Class Action Allegations as to the Defendant Class (LCvR 23.1(A)(1))

80.     Named Plaintiff also brings this supplemental and amended complaint against the Defendant PRMG individually and on behalf of a class of all others similarly situated. PRMG and each of the Defendant Class members engages Cenlar as their "private label" authorized servicing vendor and agent for the collection of their borrowers' mortgage payments and the administration and accounting of those payments.  To the extent the members of the Defendants Class are separate entities operating different locations, each have the same interest as PRMG since the conduct and omissions subject to the TILA Class members claims concerns the standard duties each have delegated to Cenlar to perform on their behalf.  Further, upon information and belief Cenlar has agreed to indemnify each member of the Defendant Class for errors caused by its failure to not promptly credit payments received from borrowers into its records and other standard mortgage servicing activities it has been engaged to perform on behalf of the members of the Defendant Class.

81.     The Named Plaintiff proposes that PRMG be appointed as the Named Defendant on behalf of the Defendant Class and that the Defendant Class be defined as follows:

The Defendant Class is comprised of all Cenlar mortgage clients for whom in the twelve months preceding the filing of this pleading:

a.    Cenlar has provided "private label" servicing[4] related to the acceptance and crediting of monthly, mortgage payments mortgage payments and the administration and accounting of those payments on behalf of the client and in the client's name; and

b.    Cenlar's mortgage client qualifies as a creditor pursuant to 15 U.S.C.A. § 1602(g) in relation to the TILA Class members.

82.    Based on public disclosures, including some of those discussed herein, the size of the Defendant Class upon information and belief, the class is so numerous as to make it impracticable to join all members of the Defendant Class. On information and belief, the class is comprised of more than fifty mortgage companies throughout the United States.  LCvR 23.1(a)(2)(i).  Further, In addition, the Defendant Class definition in ¶ 81 may be amended or modified based on the course of discovery as this matter proceeds.

83.    PRMG and all putative Defendant Class members operate under the same policies, practices, and procedures and none of them have any different policies, practices, or procedures in place related to the claims asserted by the TILA Class herein.  Cenlar controls these functions, practices, practices, and policies for PRMG and each putative Defendant Class member.

84.    Given that PRMG and the putative Defendant Class members operate under the same policies, practices, procedures and control, there are questions of law and fact which are common to all members of the Defendant Class, which questions predominate over any question affecting only individual Defendant Class members, the principal common issues are (LCvR 23.1(a)(2)(iii)):

a.    Whether the TILA Class members' mortgage payments were promptly credited to their accounts as required by TILA and Regulation Z; and/or

---

[4]    The term "private label" servicing is defined *supra*.  *See also* ¶¶ 17.b, 30

b.    Whether the TILA Class Members are entitled to prejudgment interest on any amounts they are owed by the Defendant Class members for actual damages.

85.    The only individual questions concern the identification of Defendant Class members which are part of Cenlar's and the members of the Defendant Class' business records and the computation of the relief that the Defendant Class members may be liable for actual and statutory damages under TILA, and can be determined by a ministerial examination of the Defendant Class members' electronically stored information that is readily available to Cenlar, PRMG, and each member of the Defendant Class since they are required to maintain such data as a matter of law for the entire class period.

86.    PRMG's position or defenses to the claims are typical of the position or defenses of the Defendant Class members. Upon information and belief, the Defendant Class members treated all of the TILA Class members the same by failing to promptly credit their payments received by Cenlar acting on behalf of and with the express authority of PRMG and the Defendant Class members.   LCvR 23.1(a)(2)(iv).

87.    Defendant PRMG will fairly and adequately protect the interests of all Defendant Class members in the defense of this action. It is similarly situated to each Defendant Class member and has engaged Cenlar for the same vendor servicers subject to this action as have each member of the Defendant Class.  To that end, Defendant PRMG has retained counsel experienced in handling class action suits involving claims as set forth in this complaint. Neither PRMG nor its counsel will have any interest which might cause them not to vigorously defend this action and the interests of the Defendant Class members.   LCvR 23.1(a)(2)(ii).

88.    The Defendant Class members have and are acting in a uniform manner with respect to the entire class and on grounds uniformly applicable to the class. LCvR 23.1(a)(2)(iv).

89.     A class action is superior to other available methods for the fair and efficient adju-
dication of the controversy.  In one action as proposed by the Named Plaintiff herein, the Defend-
ant Class members' individual interests are aligned and same actions and omissions are part and
parcel of the TILA claims presented.  No other claims litigation has been filed to the knowledge
of the Named Plaintiff as of this filing.  LCvR 23.1(a)(2)(iv).

90.     The Defendant Class members can more economically defend the claims rather
than defend tens if not hundreds of individual actions. LCvR 23.1(a)(2)(iv).

91.     The concentration of the litigation concerning this matter in this Court is desirable.

92.     A failure of justice will result from the absence of a class action.

### COUNT I:  VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
### ("RESPA"), 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.41
### (On behalf of the Named Plaintiff Individually and
### on behalf of the RESPA Class against Cenlar and PRMG)

93.     The Named Plaintiff adopts by reference the factual allegations contained in the
preceding paragraphs of this Complaint with the same effect as if herein fully set forth.

94.      The Named Plaintiff and RESPA Class members are "borrowers" entitled to the
protections codified at 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41.

95.     PRMG is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A.
§ 2605 and 12 C.F.R. § 1024.41 in relation to the Named Plaintiff and RESPA Class members.

96.     Cenlar is also a mortgage servicer subject to the mandatory requirements of 12
U.S.C.A. § 2605 and 12 C.F.R. § 1024.41 in relation to the Named Plaintiff and RESPA Class
members even though it is undisclosed as such as part of its private label servicing.

97.     Cenlar's relationship as an undisclosed servicer with the Plaintiff's loan and the
loans of the RESPA class members violates the disclosure requirements of 12 U.S.C.A. §
2605(b)(c).  Here, this failure was material, because as shown if Cenlar had properly disclosed its

servicing role to Plaintiff and the members of the RESPA class they could have addressed their complaints and errors to the OCC as Cenlar's regulator. By concealing its identity Cenlar also kept the OCC in the dark just how bad its business was in this regard since no RESPA members knew the OCC was an option for help.

98.    Pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), PRMG and Cenlar have legal duties to cease furnishing or providing adverse information to any consumer reporting agency regarding any allegedly overdue payment payments that are subject to QWR/NOEs from the Named Plaintiff and RESPA Class members that they has received.

99.    The Named Plaintiff and the RESPA Class members each sent Cenlar acting on behalf of PRMG and other members of the Defendant Class QWR/NOEs concerning accounting, disputed payments, and/or sums claimed due from them by Cenlar acting on behalf of PRMG and members of the Defendant Class.

100.    Cenlar on behalf of PRMG and members of the Defendant Class received those written QWR/NOEs at the addresses Cenlar through PRMG and the members of the Defendant Class published for such correspondence.

101.    In contravention of its mandatory duties pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) and as part of its pattern, practice, and/or custom during the three years preceding the commencement of this action, Cenlar, using PRMG's and the names of the members of the Defendant Class, did not suppress its credit reporting to the credit reporting agencies, including Experian, Equifax, and/or TransUnion, related to the period of times disputed by the Named Plaintiff's and the RESPA Class members' QWR/NOEs. Rather, as part of Cenlar's unsafe and unsound systems, practices, and procedures, it only attempted to suppress future payments not subject to the QWR/NOEs.

102.    Upon information and belief, based upon the experiences of the Named Plaintiff and other borrowers discussed herein, and also the following facts and allegations, Cenlar and PRMG have a pattern and practice of noncompliance with the requirements of 12 U.S.C.A. § 2605 and its implementing regulations for borrowers like the Named Plaintiff and RESPA Class members:

  a.    As of May 24, 2021 there are 115 public complaints against PRMG in the CFPB's complaint database which concern or related to its mortgage servicing business and errors related to the servicing, escrow and accounting practices subject to and related to its responsibilities pursuant to RESPA and its implementing regulations.

  b.    Its own vendor to whom it delegates such responsibilities and duties—i.e. Cenlar—has a pattern and practice of practices which violate 12 U.S.C.A. § 2605 as part of its "private label" servicing as discussed *supra*. *See also* ¶¶ 9, 17.b, 30-31.

103.    The Named Plaintiff and each RESPA Class member suffered nominal damages of no less than $5.00 to take the time and expense to send their QWR/NOE to PRMG which entitled them to certain rights—including those stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1)—which amount to actual damages since as part of Cenlar's and PRMG's custom, practice, and/or policy they never seeks to suppress any negative, derogatory reporting subject to the borrowers' QWRs/NOEs with the credit reporting agencies.

**Count II:  VIOLATION OF THE TRUTH IN LENDING ACT**
**15 U.S.C.A. § 1639f and 12 C.F.R. § 1026.36(c)(1)(i)**
**(On behalf of the Named Plaintiff Individually and**
**on behalf of the TILA Class against PRMG and each member of the**
**Defendant Class)**

104.    The Named Plaintiff adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.   This claim

is brought by the Plaintiff on his behalf individually and on behalf of the TILA Class members against Defendant PRMG individually and members of the Defendant Class.

105.    PRMG and the Defendant Class members were required to promptly credit the monthly mortgage payments they received directly or indirectly through their authorized vendor Cenlar from the Named Plaintiff and TILA Class members. 15 U.S.C.A. § 1639f; 12 C.F.R. § 1026.36(c)(1)(i).

106.    In addition, the Official Interpretations implementing 12 C.F.R. §1026.36, which are a regulation issued pursuant to notice and comment rulemaking and have the force and effect of law, state:

Paragraph 36(c)(1)(iii)

1. **Payment requirements.** The servicer may specify reasonable requirements for making payments in writing, such as requiring that payments be accompanied by the account number or payment coupon; setting a cut-off hour for payment to be received, or setting different hours for payment by mail and payments made in person; specifying that only checks or money orders should be sent by mail; specifying that payment is to be made in U.S. dollars; or specifying one particular address for receiving payments, such as a post office box. The servicer may be prohibited, however, from requiring payment solely by preauthorized electronic fund transfer. *See* section 913 of the Electronic Fund Transfer Act, 15 U.S.C. 1693k.

2. **Payment requirements - Limitations.** Requirements for making payments must be reasonable; it should not be difficult for most consumers and potential successors in interest to make conforming payments. For example, it would be reasonable to require a cut-off time of 5 p.m. for receipt of a mailed check at the location specified by the servicer for receipt of such check.

3. **Implied guidelines for payments.** In the absence of specified requirements for making payments, payments may be made at any location where the servicer conducts business; any time during the servicer's normal business hours; and by cash, money order, draft, or other similar instrument in properly negotiable form, or by electronic fund transfer if the servicer and consumer have so agreed.

107.    Yet, as a pattern and practice since August 24, 2020 PRMG and the Defendant Class members have failed to promptly credit payments received from the Named Plaintiff and the

TILA Class as a result of their authorized vendor Cenlar's acts and omissions on their behalf. This conclusion is based on the experiences of the Named Plaintiff described herein and also the public complaints against Cenlar for similar described *supra*.

108.   PRMG's and the Defendant Class members' handling of Named Plaintiff's and the TILA Class members' payments without promptly crediting them when received is a violation of 15 U.S.C.A. § 1639f; 12 C.F.R. § 1026.36(c)(1)(i) by failing to promptly credit payments received and then imposing late and other default fees that were not due and owing.

109.   PRMG and the Defendant Class members failure to promptly credit Named Plaintiff's Payments and the payment of the TILA Class members violates 15 U.S.C.A. § 1639f and 12 C.F.R. § 1026.36(c)(1)(i).

110.   PRMG also provided Plaintiff an inaccurate payoff statement in June 2021 which sought sums from him that were not owed and therefore the statement was in violation of 15 U.S.C.A. § 1639g and 12 C.F.R. § 1026.36(c)(3).

111.   As a direct and proximate result of the violations by PRMG and the members of the Defendant Class to promptly credit payments received from the TILA Class members, the Named Plaintiff and TILA Class members are entitled to actual damages (i.e. late fees and/or defaults imposed or collected) and statutory damages from each member of the Defendant's Class as defined by TILA.

**Count III:  VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.41 (On behalf of Ntam Individually against PRMG and Cenlar)**

112.   The Named Plaintiff adopts by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth. This claim is brought by the Plaintiff on his behalf individually against PRMG.

113.    Cenlar and PRMG had duties of care under 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35 to acknowledge in writing Plaintiff's Ntam QWE/NOE/RFI (including notices of error and requests for information) within five days and to respond to the Ntam QWE/NOE/RFI after conducting a reasonable investigation in writing within 30 days (unless they seek an extension of not more than 15 days).

114.    The Ntam QWE/NOE/RFI described herein at ¶¶ 46-53 was sent to the address published by Cenlar on behalf of PRMG for such communications and Cenlar and PRMG received it.

115.    Cenlar and PRMG also had duty of care under 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35 to conduct a reasonable investigation of the Ntam QWE/NOE/RFI and each failed to do any reasonable investigation as demonstrated *supra* and including their: (i) failure to provide the information sought in the Ntam QWE/NOE/RFI, (ii) lack of any substantive response to Ntam QWE/NOE/RFI, and (iii) the lack of correct of any errors identified by Ntam in the Ntam QWE/NOE/RFI until at least ten months after the fact and only after Ntam had incurred substantial damages and losses and attorney's fees caused by PRMG's and Cenlar's unsafe and unsound mortgage practices described herein.

116.    As a direct and proximate result of these violations Plaintiff is entitled to his actual damages pursuant to 12 U.S.C.A. § 2605(f) described *supra*.

### PRAYER FOR RELIEF

I.    WHEREFORE, Named Plaintiff and RESPA Class members ask this Court to certify the RESPA Class pursuant to Fed.R.Civ.P. 23 and appoint the Named Plaintiff as class representatives and the undersigned counsel as Class Counsel related to the Claims asserted in Count I;

II.  WHEREFORE, Named Plaintiff and RESPA Class members ask this Court, under Count I, to determine the issues of Cenlar's and PRMG's liability to the RESPA Class members for awards of actual damages for its violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) pursuant to 12 U.S.C.A. § 2605(f)(2)(A) and Fed.R.Civ.P. 23(c)(4) to permit the RESPA Class members to pursue their actual damages, if any, in separate actions but to determine liability in favor of the Named Plaintiff individually and award individual, actual damages in this action to him in the sum of $75,000 (for his claims under Counts I & III);

III. WHEREFORE, Named Plaintiff and RESPA Class members ask this Court to determine the issue of Cenlar's and PRMG's liability to the Named Plaintiff and RESPA Class members for an award of statutory damages available pursuant to Count I and for its violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) pursuant to 12 U.S.C.A. § 2605(f)(2)(B)(i) in the sum of $1,000,000 since upon information and belief PRMG's and Cenlar's net worths exceed $100,000,000;

IV. WHEREFORE, Named Plaintiff and RESPA Class members ask this Court under Count I to award to costs and attorney fees to them and their undersigned counsel pursuant to 12 U.S.C.A. § 2605(f)(3);

V.  WHEREFORE, Named Plaintiff and TILA Class members ask this Court under Count II to certify the TILA Class pursuant to Fed.R.Civ.P. 23 and appoint the Named Plaintiff as class representatives and the undersigned counsel as Class Counsel;

VI.    WHEREFORE, Named Plaintiff and TILA Class members ask this Court under Count II and pursuant to 15 U.S.C.A. § 1640 to award them (i) actual damages and (ii) statutory damages imposed against each member of the Defendant's Class of no less than $1,000,000 or 1 per centum of its net worth.  In the alternative, Named Plaintiff and TILA Class members request that a sub-class be established related to each Defendant Class member to determine the sum of statutory damages available for those TILA Class members related to that Defendant Class member.

VII.    WHEREFORE, Named Plaintiff and TILA Class members ask this Court, under Count III, to award to costs and attorney fees to them and their undersigned counsel pursuant to 15 U.S.C.A. § 1640;

VIII.    WHEREFORE, Named Plaintiff requests the Court provide such other or further relief as the Court deems appropriate including attorney fees and costs in relation to Count of this Complaint.

[signatures on next page]

Respectfully submitted,

/s/Phillip R. Robinson
Phillip R. Robinson
Bar No. MD27824
Consumer Law Center LLC
10125 Colesville Road, Suite 378
Silver Spring, MD  20901
Phone (301) 448-1304

Brent S. Snyder, Esq.
Admitted Pro Hac Vice
2125 Middlebrook Pike
Knoxville, TN 37921.
Phone: (865) 264-3328
brentsnyder77@gmail.com

Robert P. Cocco, Esq.
Admitted Pro Hac Vice
1500 Walnut Street - Suite 900
Philadelphia, PA  19102
Phone: (215) 351-0200
bob.cocco@phillyconsumerlaw.com

*Counsel for the Class and Putative RESPA Class & TILA Class Members*

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing and attached exhibits were sent to the fol-

lowing counsel for the Defendant when filed with the Court's CM/ECF system:

Carlos Marin
Dale Evans
Thomas Cunningham
Regina McClendon
Locke Lord LLP
777 South Flagler Drive
East Tower, Suite 215
West Palm Beach, FL  33458
Carlor.Marin@lockelord.com
Dale.Evans@lockelord.com
TCunningham@locklord.com
RMclendon@locklord.com


/s/ Phillip Robinson
Phillip Robinson