**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VICTOR NTAM**, | |
| *Individually and on behalf of two classes of Similarly Situated Persons.* | |
| Plaintiff, | |
| v. | Civil Case: 1:21-cv-01583-JMC |
| **PARAMOUNT RESIDENTIAL MORTGAGE GROUP, INC., CENLAR FSB,** | |
| Defendants. | |

---

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

---

Defendants Paramount Residential Mortgage Group, Inc. ("PRMG") and Cenlar FSB ("Cenlar") move for summary judgment in their favor on the Second Amended & Supplemental Class Action Complaint ("SAC") filed by plaintiff Victor Ntam ("Plaintiff"). In the alternative, PRMG moves for partial summary judgment in its favor on each count alleged against it in the SAC, and Cenlar moves for partial summary judgment in its favor on each count alleged against it in the SAC. PRMG and Cenlar bring this motion under Federal Rule of Civil Procedure 56 and LCvR 7(h).

This grounds for this motion are set forth in the below Memorandum and in the Statement of Undisputed Facts and evidence accompanying this Motion.

DATED:  September 2, 2022                    Respectfully submitted,


                                            /s/ *Regina J. McClendon*
                                            Thomas J. Cunningham
                                            Bar No. FL0090
                                            tcunningham@lockelord.com
                                            Dale A. Evans Jr.
                                            Bar No. FL0091
                                            dale.evans@lockelord.com
                                            Locke Lord LLP
                                            777 South Flagler Drive
                                            East Tower, Suite 215
                                            West Palm Beach, FL 33458
                                            Phone: (561) 833-7700

                                            Regina J. McClendon
                                            Bar No. CA00112
                                            rmcclendon@lockelord.com
                                            Lindsey E. Kress (*pro hac vice*)
                                            lkress@lockelord.com
                                            Locke Lord LLP
                                            101 Montgomery Street, Suite 1950
                                            San Francisco, CA 94104
                                            Phone: (415) 318-8810

                                            Carlos Marin
                                            Bar No. IL6326103
                                            carlos.marin@lockelord.com
                                            Locke Lord LLP
                                            111 S. Wacker Dr.
                                            Chicago, IL 60606
                                            Phone: (312) 443-1837

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendants Paramount Residential Mortgage Group, Inc. ("PRMG") and Cenlar FSB ("Cenlar") move under Federal Rule of Civil Procedure 56 and LCvR 7(h) for summary judgment, or in the alternative, partial summary judgment, as to each count alleged against them in the Second Amended & Supplemental Class Action Complaint ("SAC") filed by plaintiff Victor Ntam ("Plaintiff").

## I.   INTRODUCTION

This dispute largely stems from Plaintiff's failure to send his November 2020 mortgage payment to the proper address and with the correct account number, resulting in a delinquency on his account.  The issue was resolved in 2021 when the payment was located in PRMG's records and the funds were forwarded to Cenlar.  Cenlar then applied the November 2020 payment to Plaintiff's account and reversed all late charges and negative credit reporting. Nonetheless, Plaintiff brings this action alleging that PRMG violated the Truth in Lending Act ("TILA") by failing to credit payments made on his mortgage loan and by failing to provide an accurate payoff quote for the subject loan.  Plaintiff further claims that PRMG and Cenlar violated the Real Estate Settlement Procedures Act ("RESPA") by failing to suppress credit reporting for the required period after receiving Plaintiff's qualified written request/notice of error regarding the missing payment and by failing to conduct a reasonable investigation and/or respond to his dispute.

The undisputed evidence shows that Plaintiff cannot prevail on his TILA claim against PRMG because (1) the sections of the statute Plaintiff sues under do not apply to PRMG or the subject Loan, (2) there was no violation of the statute by PRMG, and (3) even if a violation is

found, PRMG is not liable under TILA because any such violation was unintentional and the result of a bona fide error despite the maintenance of procedures to avoid such violations.

The undisputed evidence further shows that Plaintiff cannot prevail on his RESPA claims against either PRMG or Cenlar because (1) the statute does not apply to Plaintiff's Loan and (2) even if it did apply, there was no violation.  He cannot prevail on his RESPA claims against Cenlar for the additional reason that it is not the Loan's "servicer" as defined in RESPA.

For all the reasons set forth below, PRMG and Cenlar are entitled to summary judgment in their favor as to each count pled against them in the SAC.

## II.    FACTUAL BACKGROUND

### A.  Plaintiff purchased the Property in July 2020 and advertised it for rent immediately thereafter.

On July 23, 2020, Plaintiff purchased the property located at 1021 51st Street NE, Washington, DC (the "Property").  SOF 1.[1]  Plaintiff acquired the Property with the proceeds of a $438,866 loan from PRMG evidenced by a promissory note and secured by a deed of trust (the "Loan").  SOF 2. The Loan required monthly payments beginning on September 1, 2020 and provided a 15-day grace period before any late charge would be imposed on the Loan.  SOF 3.

Plaintiff represented he would occupy the Property as his principal residence, including in his loan application, which states the property is to be his primary residence and that he intends to occupy the property as his primary residence.  SOF 4.  The Deed of Trust he signed at closing similarly states, "Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy…."  SOF 5.

---

[1] "SOF" refers to Defendants' Statement of Undisputed Facts filed herewith.

Contrary to these representations, Plaintiff sought to rent out the Property **three days** after the July 23, 2020 Loan closing (if not earlier), as shown in emails between Plaintiff and his sister/real estate agent Marie-Claire Ntam dated July 26, 2020.  SOF 6.  On July 28, 2020, five days after obtaining the Loan, Plaintiff and Keller Williams Capital Properties, the real estate brokerage company with which Marie-Claire Ntam is affiliated, executed a Non-Management Rental Listing Agreement for the Property.  SOF 7.  Marie-Claire Ntam advertised the Property for rent through the Bright Multiple Listing Service, which syndicated the listing to over 200 third party websites, and at least one open house was scheduled.  SOF 8.  Over the course of several months, Marie-Claire Ntam negotiated with real estate agents representing several prospective tenants, received applications from prospective tenants, and met with and fielded other real estate agents' questions about the Property.  SOF 9.  Plaintiff and Marie-Claire also texted one another on a number of occasions about the rental listing, discussing such matters as the rental amount, evaluation of prospective tenants, acceptance of rental vouchers, and tenant parking.  SOF 10.  Plaintiff evaluated prospective tenants based on factors such as income, rental history with other landlords, and credit criteria.  SOF 11.  In one of the texts, Plaintiff states, "I am excited to see what this *new business venture brings forth* for everyone… laundromat *& my house*."  SOF 12 (ellipses in original; emphasis added).

Ultimately, Plaintiff executed two lease agreements for the Property, one on November 17, 2020 with a tenant named Rachel Bennett, and the other on June 15, 2021 with a tenant named Desha Butler. SOF 13.

Plaintiff is a licensed general contractor and is the CEO of Ntam Construction, LLC, which specializes in home renovations, among other things.  SFO 14.  Plaintiff admits he has

never moved into or occupied the Property.[2] SOF 15.  In fact, Plaintiff pays $1200 per month to his sister Marie-Claire Ntam, and sometimes more, to live in a house on Brighton Lane in Maryland.  SOF 16.

Further, even though Plaintiff has maintained a personal checking account at a credit union for many years, Ntam Construction, LLC makes all payments on the Loan from its bank account; no Loan payments have been made from Plaintiff's personal account.  SOF 19, 20.

**B.  PRMG engages Cenlar; Plaintiff sends his November 2020 payment for the Loan to the wrong address.**

PRMG was the original lender for the Loan, but sold the Loan to the Federal National Mortgage Association, known as Fannie Mae, effective August 3, 2020.  SOF 21.

PRMG remained the servicer of the Loan and engaged a subservicer, Cenlar, effective September 1, 2020.  SOF 22.  On or about July 30, 2020, Cenlar sent Plaintiff a letter to his address of record (the Property address)[3] advising of the servicing transfer and instructing, "[s]end all payments due on or after September 1, 2020 to Paramount Residential Mortgage Group, Inc. at this address: PO Box 11733 Newark, NJ 07101-4733."  SOF 24.  The letter also stated that his new loan number would be xxxxxx4100.  SOF 25. (The full account number ending in 4100 was included in the letter, but is not provided here for privacy reasons.) There is no record that this letter was returned undeliverable.  SOF 26.  PRMG sent a virtually identical letter, also on July 30, 2020, and there is no record it was returned undeliverable. SOF 27.

---

[2] Plaintiff tries blame PRMG for his failure to move into the Property, but the negative credit reporting that he claims prevented him from moving in did not occur until January 5, 2021, more than five months after he purchased the Property.  SOF 17.  And, even though Plaintiff wanted to make renovations to the house to bring it up to his "standard of living," the Property had functioning electricity, plumbing, heating and cooling, windows, and doors when he bought it.  SOF 18.  In fact, he "fell in love with" the house and found it "beautiful."  *Id*.

[3] At closing, Plaintiff directed PRMG to send correspondence to the Property address.  SOF 24.

Cenlar began sending monthly account statements to Plaintiff's address of record, the Property address, including on July 31, 2020, September 4, 2020, and October 7, 2020. SOF 28. Each of these statements directed Plaintiff to send any mailed payment to the Newark, NJ post office box and included the loan number ending in 4100.  SOF 29.  These statements were also available for Plaintiff to view or download by logging into his account at prmg.loanadministration.com.[4]  SOF 30.

Notwithstanding the notices of servicing transfer, the monthly account statements, and information available online, Plaintiff sent a check for the November 1, 2020 payment to the prior payment address in Corona, California, not to the specified address in Newark, New Jersey. SOF 31.  The check did not identify it as payment on the loan number ending in 4100.  SOF 32. The check was written on an account at Industrial Bank held by Ntam Construction, LLC, an entity that is not the borrower on the loan.  SOF 33.  Because Plaintiff did not send the November 2020 payment to the correct address, Cenlar did not receive the November 2020 payment for the Loan at the time (SOF 34), and the account was considered delinquent as a result.

On December 21, 2020, Plaintiff confirmed in a phone call that the mailing address being used (the Property address) was correct, but he stated he was not receiving mail.  SOF 35.  At Plaintiff's request on December 21, 2020, the mailing address on the account was changed to an address on Brighton Lane in Maryland that he reported to be his mother's.  SOF 36.  Plaintiff concedes that after he changed his mailing address to his mother's address, he received his mail. SOF 37.

---

[4] Plaintiff began accessing his Loan account ending in 4100 through the website made available by Cenlar for PRMG customers, prmg.loanadministration.com, starting no later than January 9, 2021.  SOF 38.

### C.  Plaintiff sends a QWR/NOE.

On February 22, 2021, PRMG's subservicer Cenlar received correspondence from Plaintiff claiming that his November 2020 monthly payment had not been credited, which he asserted led to late fees and inaccurate reporting to the credit reporting agencies (CRAs).  SOF 39.  Cenlar treated this letter as a qualified written request ("QWR") under RESPA.  SOF 40. Cenlar suppressed the credit reporting for Plaintiff's loan for more than 60 days upon receipt of the QWR and subsequently investigated Plaintiff's dispute.  SOF 41.  It accomplished the suppression of credit reporting by entering the code "QWR60D" into its servicing system on February 22, 2021.  SOF 42.  Cenlar did not make any credit reporting regarding Plaintiff's loan in March 2021, April 2021, or May 2021 (its February reporting had occurred on February 5, 2021, before the date of the QWR).[5]  SOF 43.   Cenlar resumed credit reporting on the Loan on June 7, 2021. SOF 45.

Cenlar acknowledged receipt of Plaintiffs' QWR in writing on February 22, 2021.  SOF 46.  Cenlar then informed Plaintiff that it required the 15-day extension permitted by RESPA on March 24, 2021, thus extending its response deadline.  SOF 47. Cenlar's investigation confirmed that the November 2020 payment had not been received by Cenlar, and it confirmed its findings to Plaintiff in written correspondence addressed to Plaintiff's Brighton Lane address of record, dated April 6, 2021.  SOF 48.

Cenlar mailed its written response to the QWR on April 8, 2021, as shown in its outgoing mail log.  SOF 49.  All pages of the QWR response bear the number 528667 in the lower left hand corner; this code matches the number in the "NCP Job ID" column on the mail log.  SOF

---

[5] PRMG did not itself make any reports to the CRAs concerning Plaintiff's Loan payments; this function is handled by its subservicer Cenlar.  SOF 44.

50. The mail log also references Plaintiff's loan number ending in 4100.  SOF 51. While Plaintiff denies receiving the letter, it was in fact mailed and was not returned undeliverable. SOF 52.

PRMG has a process in place to regularly forward payments it receives at its Corona, California address to its subservicer Cenlar if a borrower submits a payment to the Corona address after a loan has been transferred to Cenlar for subservicing.  SOF 53.  Such payments are forwarded as needed and as checks come in, but this process typically occurs several times a week.  SOF 54.  PRMG creates a spreadsheet listing the payments it has received, which includes information such as the borrower name, date of payment receipt, account numbers, and payment amount.  SOF 55.  That spreadsheet is sent to Cenlar, along with the payment funds, and Cenlar, in turn, applies such payments effective as of the date of PRMG's receipt.  SOF 56. Multiple check payments made by Plaintiff after September 1, 2020 were handled in precisely this manner, that is, PRMG forwarded them to Cenlar, which then applied them with an effective date of PRMG's receipt.   SOF 57.  In deposition, Plaintiff conceded this process was effective as to all of his payments except the November 2020 payment.  McClendon Decl., Ex. 31 at 87:16-88:22.

However, due to a clerical error, Plaintiff's check for the November 1, 2020 loan payment was not included in PRMG's regularly prepared spreadsheet and was not immediately forwarded to Cenlar.  SOF 58.  This clerical error of not listing the payment received on the regularly prepared spreadsheet affected one (and only one) of his check payments, whereas all other payments received by PRMG after the applicable loan had been transferred to Cenlar for subservicing were listed in the spreadsheets and promptly forwarded and applied by Cenlar, as Plaintiff admits.  SOF 59.

### D. The November 2020 payment was subsequently located and all late charges and negative credit reporting were reversed.

PRMG subsequently located the record of receipt of the November 2020 payment.  SOF 60. Once located by PRMG on June 10, 2021, the funds were promptly forwarded to Cenlar. SOF 61.  On June 14, 2021, Cenlar applied the November 2020 payment.  SOF 62.  Cenlar then reversed out and reapplied subsequent payments to reflect their timely receipt.[6]  SOF 63.  Cenlar waived all late fees and also instructed the CRAs to remove all negative reporting that had occurred on Plaintiff's Loan.  SOF 66.

### E. Plaintiff obtained a significant tax benefit based on his representation of the Property's occupancy by a tenant.

On June 7, 2021, Plaintiff submitted a Vacant Building Response form to the Government of the District of Columbia, Department of Consumer and Regulatory Affairs, in which he affirmed that the Property is occupied.  SOF 67.  The Vacant Building Response form states that if accepted, his property taxes will not change. Plaintiff signed the form, affirming the information is "complete and accurate."  SOF 68.  Plaintiff testified in this case under penalty of perjury that he has never moved into or occupied the Property (SOF 15), so his representation that the Property was occupied necessarily must have referred to someone else's occupancy.

On June 11, 2021, the Government of the District of Columbia, Department of Consumer and Regulatory Affairs, advised Plaintiff that his request for a property tax exemption for fiscal year 2021 had been denied because the DC Water and Pepco bills he submitted with his exemption request "show no/low usage."  SOF 69.  The letter advised Plaintiff that he had 15 days to appeal this decision and directed him to "provide substantial evidence to support your

---

[6] On a December 21, 2020 phone call, a Cenlar representative acknowledged receipt of the November payment to a PRMG representative.  SOF 64. The payment she was referring was the check received by Cenlar on December 3, 2020, which was applied by Cenlar to the November installment.  SOF 65.

claim that the property is occupied." SOF 70.  If he elected not to appeal, he was required to register the Property as vacant and pay a $250 fee.[7]  SOF 71.  In response, Plaintiff submitted a Residential Lease between himself and a tenant executed on June 15, 2021.[8]  SOF 72.  The next day, the Government of the District of Columbia, Department of Consumer and Regulatory Affairs advised that Plaintiff's request for an exemption had been approved and the Property would not be deemed vacant. SOF 73.

In addition to avoiding the $250 vacant property registration fee, the designation of the Property as tenant-occupied saved Plaintiff thousands of dollars in property taxes.  In Washington DC, property taxes are assessed at $0.85 per $100 in value for a Class 1 property (residential property); the assessment is $5.00 per $100 in value for a Class 3 property (vacant real property).  SOF 74. For a property with a value of $450,000,[9] the annual property taxes would be $3,825 on a Class 1 property, versus $22,500 on a Class 3 property.[10]

---

[7] DC Official Code § 42-3131.06 requires property owners to register vacant buildings with the Vacant Building Administration within 30 days of the beginning of each fiscal year and within 30 days of it becoming vacant, in addition to paying an initial registration fee of $250 and a renewal fee of $250 each year the property remains vacant.  DC Official Code §§ 42-3131.06, 42-3131.09, 42-3131.11.

[8] The Residential Lease produced by the Government of the District of Columbia, Department of Consumer and Regulatory Affairs in response to Defendants' Freedom of Information Act Request has the tenant's identifying information redacted, but it appears to be the same lease as the unredacted version of the lease between Plaintiff and his girlfriend Desha Butler produced by Marie-Claire Ntam. *Compare* McClendon Decl., Ex. 37, p. PRMG_Ntam 004370-004381 *with* McClendon Decl., Ex. 33 (Ex. 39 to Marie-Claire Ntam Depo.).  What is important is that Plaintiff reported the Property as tenant-occupied and received a substantial monetary benefit as a result.

[9] The Property has an assessed value of $355,380 for fiscal year 2021 and $457,800 for fiscal year 2022. SOF 75.

[10] These amounts are subject to adjustment based on availability of other exemptions, such as a homestead deduction or trash credit. https://otr.cfo.dc.gov/page/real-property-tax-rates

### F. Cenlar properly rejected an electronic payment sent in July 2021 with no identifying account information.

On June 14, 2021, Cenlar sent another monthly account statement to Plaintiff at his address of record on Brighton Lane.  SOF 76. The June 14 statement advised that his next payment was due on July 1, 2021.  SOF 77.  Like the others, it advised that any mailed payment should be sent to the post office box in Newark, New Jersey.  SOF 78. The statement also, once again, referenced the account number ending in 4100.  SOF 79.  The statement indicated that the "current payment due [on] 07/01/21" was for $2,793.55.  SOF 80.  The statement was not returned as undeliverable (SOF 81), and Plaintiff concedes that after he changed his mailing address to his mother's address on Brighton Lane, he received mail (SOF 37). Additionally, as of January 2021, at the latest, Plaintiff had been accessing his account online.  SOF 38.

Ntam Construction, LLC made Plaintiff's July 2021 loan payment through the "bill pay" system at its bank, Industrial Bank, not by mailed check.  SOF 82.  That payment was received electronically by Cenlar through a company called Check Free, which Cenlar understands is a vendor used by certain banks to process their customers' payments over "bill pay."  SOF 83.  In July 2021, Cenlar received a data feed for multiple "Check Free" transactions, which included a payment in the amount of $2,784.78 from "Ntam Constructi" for an account number ******4577.[11]  SOF 84.  No other identifying information was included.  SOF 85.  This payment could not be matched to any loan in Cenlar's records because it does not subservice a loan for "Ntam Constructi" (or Ntam Construction) and it does not subservice a loan bearing account number ******4577.  SOF 86.  Further, the payment amount of $2,784.78 did not match the amount due for Plaintiff's July 2021 payment, which was $2,793.55.  SOF 87.  Because the data

---

[11] All digits of an account number ending in 4577 were included in the data received (SOF 84), but are not provided here for privacy reasons.

accompanying the payment through Check Free could not be matched to a loan subserviced by

Cenlar, Cenlar returned the payment through the Check Free system and notified Check Free of

the return. SOF 88.

## III.   LEGAL ARGUMENT

### A.  Legal Standard

Summary judgment is warranted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  The party seeking summary

judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of

material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may

successfully support its motion by identifying those portions of "the pleadings, the discovery and

disclosure materials on file, and any affidavits" which it believes demonstrate the absence of a

genuine issue of material fact. Fed.R.Civ.P. 56(c)(2); *Celotex,* 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude

summary judgment, the court must regard the non-movant's statements as true and accept all

evidence and make all inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 255 (1986).  However, the non-moving party must establish more than the "mere

existence of a scintilla of evidence" in support of its position. *Id*. at 252. By pointing to the

absence of evidence proffered by the non-moving party, a moving party may succeed on

summary judgment. *Celotex*, 477 U.S. at 322. "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50

(citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence

on which the jury could reasonably find for the [non-movant]." *Id*. at 252.

### B. Plaintiff's second count, for violation of TILA against PRMG, fails.

Plaintiff's second count for violation of TILA claims that PRMG violated 15 U.S.C. sections 1639f and 1639g, and the implementing regulation for section 1639f, 12 C.F.R. section 1026.36(c)(1)(i), by failing to properly credit certain payments to his Loan and by failing to provide an accurate payoff quote.  PRMG is not liable under TILA for multiple reasons discussed below.

#### 1. Plaintiff's TILA claim fails because PRMG was only the loan servicer during the relevant period.

PRMG cannot be liable for the asserted TILA violations because it was merely the Loan's servicer, not the owner of the Loan, during the relevant periods.  SOF 21, 22.  Section 1640 explicitly limits civil liability to the creditor or (in some instances) its assignee; loan servicers cannot be liable for violations of TILA.  15 U.S.C. § 1640(a).  Ample case law confirms what the statutory language makes clear:  "Although the statute reaches both creditors and servicers, TILA 'imposes civil liability only on creditors and, only in limited circumstances, assignees of creditors.'"  *Bailey v. PHH Mortg. Corp.*, No. GJH-20-2577, 2021 WL 4478700, at *5 (D. Md. Sept. 30, 2021); *accord Meaney v. Nationstar Mortg.*, 2018 WL 1014927, at *8 (D. Md. Feb. 21, 2018) (dismissing TILA claim against servicer because cannot be liable under the statute); *Payne v. Seterus Inc.*, No. 16-cv-0203, 2016 WL 4521659, at *7 (W.D. La. Aug. 8, 2016) ("[C]ourts uniformly have held that there is no servicer liability under TILA.");  *Mbongo v. Specialized Loan Servicing, LLC*, No. 15-cv-2941-PJM, 2016 WL 8671841, at *5–6 (D. Md. June 24, 2016) (borrower cannot bring a TILA claim against loan servicer); *Barnes v. Carrington Mortg. Servs., LLC*, No. 15-cv-6465, 2016 WL 3018693, at *1 (D.N.J. May 24, 2016) (holding section 1640 of TILA does not create a private right of action against loan servicers, only creditors); *Kim v. Shellpoint Partners, LLC*, 2016 WL 1241541, at *6 (S.D. Cal. Mar. 30, 2016)

("TILA provides for a private right of action against creditors or lenders, not loan servicers.");

*Lucien v. Fed. Nat'l Mortg. Ass'n*, 21 F. Supp. 3d 1379, 1383 (S.D. Fla. 2014) ("The text of TILA's civil damages provision only provides for creditor liability—not servicer liability); *Iroanyah v. Bank of Am.*, *N.A.*, 851 F. Supp. 2d 1115, 1120 (N.D. Ill. 2012) (same).

Plaintiff alleges that he can nevertheless bring a TILA claim against PRMG because it was the original creditor of the Loan, and TILA defines "creditor" to include the "person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." SAC ¶ 16(c) (referencing 15 U.S.C.A. § 1602(g)). While it is true that PRMG was the original creditor, PRMG sold the Loan to Fannie Mae effective August 3, 2020. SOF 21. Plaintiff claims that PRMG failed to promptly credit payments he made on the Loan in November 2020 and July 2021 and failed to provide him with an accurate payoff statement in April 2021, in violation of sections 1639f and 1639g. SAC ¶ 110.[12] These events occurred well after the Loan's sale to Fannie Mae, while PRMG was simply the servicer of the Loan – not its owner. SOF 21, 22. The fact that PRMG was only the Loan's servicer at the time of the disputed events is dispositive of the TILA claim in its entirety.

Nor can Plaintiff rely on PRMG's status as the original creditor to save his claim under section 1639f. That is because section 1639f, which requires servicers to promptly credit payments to accounts, only applies to *servicers* – not creditors. 15 U.S.C. § 1639f ("In connection with a consumer credit transaction secured by a consumer's principal dwelling, no *servicer* shall fail to credit a periodic payment to the consumer's loan account as of the date of receipt," subject to

---

[12] Plaintiff's interrogatory responses clarify that his claim regarding the inaccuracy in the payoff statement stems from the fact that it did not account for one of his payments and also confirm that the reference to a June payoff statement in the SAC is a typographical error. McClendon Decl., Ex. 35, p. 21-22. The November 2020 payment had, in fact, not yet been forwarded to Cenlar and applied as of April 2021, as explained above.

certain exceptions); 12 C.F.R. § 1026.36(c)(1)(i)-(iii) (same); *accord Freeman v. Ocwen Loan Servicing, LLC*, No. 118CV03844TWPDLP, 2020 WL 7489033, at *11 (S.D. Ind. Dec. 21, 2020) (noting that "section 1639f only applies to servicers, not creditors or assignees"). Thus, Plaintiff cannot use PRMG's status as the original creditor to proceed with his claim under section 1639f because this section on its face does not apply to creditors. Stated differently, Plaintiff cannot have it both ways. If his position is that PRMG is liable as the creditor, then he cannot prevail because section 1639f only applies to servicers. And if his position is that PRMG is liable as the servicer, then he cannot prevail because there is no private right of action against servicers.

While section 1639g applies on its face to creditors and servicers, Regulation Z expressly states that a "[a] creditor or assignee that does not ***currently own*** the mortgage loan or the mortgage servicing rights is not subject to the requirement in this paragraph (c)(3) to provide a payoff statement." 12 C.F.R § 1026.36(c)(3) (emphasis added). PRMG did not own the Loan when the disputed payoff quote was sent in April 2021. SOF 21. Similar to section 1639f, Plaintiff cannot have it both ways. If his position is that PRMG is liable under section 1639g as the creditor, then he cannot prevail because the regulation exempts creditors who do not currently own the loan. And if his position is that PRMG is liable under section 1639g as the servicer, then he cannot prevail because there is no private right of action against servicers.

PRMG is entitled to summary judgment as to Plaintiff's claim for violation of TILA for these reasons.

> ## 2. Plaintiff's claim under section 1639f must fail because the Loan is not secured by Plaintiff's principal dwelling.

Even if Plaintiff's TILA claim applied to PRMG (and it does not), Plaintiff cannot proceed with his claim under section 1639f for the simple reason that the subject property is not – *and has never been* – his principal dwelling. SOF 15.

Plaintiff claims that PRMG violated section 1639f by failing to properly credit certain payments to the Loan, but this section only applies to "a consumer credit transaction secured by a *consumer's principal dwelling*." 15 U.S.C. § 1639f (emphasis added); 12 C.F.R § 1026.36(b) (confirming this section applies only "to closed-end consumer credit transactions secured by a consumer's principal dwelling."). Case law is in accord. *Onyeoziri v. Spivok*, 44 A.3d 279, 284 (D.C. 2012) (plaintiff could not pursue a TILA claim because TILA applies only to loans secured by the borrower's principal dwelling"); *Antanuos v. First Nat'l Bank*, 508 F.Supp.2d 466, 471 (E.D. Va. 2007) (granting summary judgment to bank on TILA claim because property used to secure credit transaction was not plaintiff's primary dwelling); *Laporte v. Wells Fargo Bank, N.A.*, No. 3:08–CV–376, 2009 WL 2146324, at *2 (E.D. Tenn. July 14, 2009) ("[I]n order for TILA to afford any relief to the plaintiffs, the property secured by the loan must be their principal dwelling. TILA specifically exempts credit transactions other than those where the security interest relates to real property to be used as the borrower's principal dwelling." (citing 15 U.S.C. § 1603(3)).

It is undisputed that Plaintiff has never occupied the Property, and that it is not - *and has never been* - his principal dwelling. SOF 15. Indeed, Plaintiff admits that he has never moved into the Property:

> Q:  I believe you said earlier you did not -- you haven't moved into the property yet. Is that correct?
> A:  That is correct.

McClendon Decl., Ex. 31 at 35:6-10. None of his personal effects are in the Property. McClendon Decl., Ex. 31 at 45:4-6. Plaintiff even reiterated that "since he purchased the property, no person has occupied the property…" in his verified supplemental interrogatory responses dated August 8, 2022. McClendon Decl., Ex. 35, p. 21. Plaintiff instead lives at his

sister's house, his mother's house, and his girlfriend's house – just as he did prior to obtaining the Loan.  McClendon Decl., Ex. 31 at 12:10-13, 18:3-8.

Because the Property is not and was not Plaintiff's principal dwelling, his section 1639f claim fails.

### 3. Plaintiff's TILA claim must fail because the Loan is not a "consumer credit transaction" and was primarily for business use.

#### a. The evidence shows that the Loan was not a "consumer credit transaction" and was primarily for business use.

Plaintiff's TILA claim fails for yet another reason.  As mentioned in the preceding section, section 1639f only applies to "a *consumer credit transaction* secured by a consumer's principal dwelling." 15 U.S.C. § 1639f (emphasis added).  "The adjective 'consumer', used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1602(i).

Section 1639g is subject to a similar limitation.  15 U.S.C. § 1603 states, "This subchapter does not apply to the following: (1) Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, or to organizations."  Section 1639g is part of the "subchapter" in which section 1603(1) appears.  Thus, section 1639g does not apply to extensions of credit primarily for business purposes.

Although Plaintiff represented otherwise to PRMG at the time of origination, the evidence shows that the transaction was not primarily for personal, family, or household purposes and was primarily for business purposes.

As discussed above, neither Plaintiff nor any other person has ever moved into the Property.  SOF 15.  The fact that neither he nor any family member has ever lived in the Property in the *two years* since its purchase is dispositive of the fact that it was not purchased primarily for personal, family, or household purposes.

But, there is additional evidence that the Property was purchased for non-personal, family, or household purposes (i.e., business purposes):

- Ntam Construction, LLC makes all payments on the Loan from its bank account; no Loan payments have been made from Plaintiff's personal account.  SOF 20.

- Plaintiff sought to rent out the Property ***three days*** after the July 23, 2020, Loan closing (if not earlier). SOF 6.

- Five days after obtaining the Loan, Plaintiff entered into a Non-Management Rental Listing Agreement with Keller Williams Capital Properties to list the Property for rent. SOF 7.

- The Property was advertised for rent on the Bright MLS, which in turn syndicated the listing to over 200 other websites, and at least one open house was scheduled.  SOF 8.

- Over the course of several months, Plaintiff's real estate agent Marie-Claire Ntam negotiated with real estate agents representing several prospective tenants, received applications from prospective tenants, and met with and fielded other real estate agents' questions about the Property.  SOF 9.

- Plaintiff executed two lease agreements for the Property, one on November 17, 2020 with a tenant named Rachel Bennett, and the other on June 15, 2021 with a tenant named Desha Butler. SOF 13.

- Plaintiff and Marie-Claire Ntam also texted one another on a number of occasions about the rental listing, discussing topics such as the rental amount, evaluation of prospective tenants, acceptance of rental vouchers, and tenant parking.  SOF 10.

- Plaintiff evaluated prospective tenants based on factors such as income, rental history with other landlords, and credit criteria.  SOF 11.

- Plaintiff sent a text to Marie-Claire Ntam that states, "I am excited to see what this *new business venture brings forth* for everyone… laundromat *& my house*."  SOF 12 (ellipses in original; emphasis added).

- In order to avoid having to pay a vacant property registration fee, and in order to obtain a continued property tax exemption, Plaintiff represented the Property to be occupied and supported his assertion with a Residential Lease between himself and a tenant executed on June 15, 2021, to the Government of the District of Columbia, Department of Consumer and Regulatory Affairs.  SOF 67-73.  But for this Residential Lease, Plaintiff's property taxes likely would have increased by nearly $20,000 per year.  SOF 74-75.

The evidence makes clear that the transaction was not primarily for personal, family, or household purposes, entitling PRMG to summary judgment in its favor on the TILA claim.

### b.    Plaintiff is estopped from arguing that the Property was for personal use.

Plaintiff is expected to try to cast doubt on this overwhelming and dispositive evidence of business use by pointing to representations he made as to his purpose for obtaining the Loan during the application process or to contend that PRMG's negative credit reporting (which did not even begin until January 5, 2021, five months after he bought the Property and has long since been deleted) somehow prevented him from moving in.  Or, he may contend he never actually received any rental payments.  The Court must disregard any such assertions.  Plaintiff's

representation to the Government of the District of Columbia, Department of Consumer and Regulatory Affairs, that the Property is occupied by a tenant, which he made in order to obtain a substantial monetary benefit, estops him from contending that the Property is anything other than tenant-occupied.

The doctrine of judicial estoppel provides that "'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position ....'" *Temple Univ. Hosp., Inc. v. Nat'l Lab. Rels. Bd*., 929 F.3d 729, 733 (D.C. Cir. 2019) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). This equitable doctrine "'prohibits parties from deliberately changing positions according to the exigencies of the moment.'" *Id*. (*quoting Davis v. D.C*., 925 F.3d 1240, 1256 (D.C. Cir. 2019)).

Although there is no "'exhaustive formula for determining the applicability of judicial estoppel,'" the Supreme Court has articulated "three key factors that 'inform the decision' whether 'the balance of equities' favors applying the doctrine in a particular case: (1) whether the party's later position is 'clearly inconsistent' with its earlier position; (2) 'whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) 'whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Temple Univ. Hosp*., 929 F.3d at 733 (*quoting New Hampshire v. Maine*, 532 U.S. at 750-751).

Despite its name, judicial estoppel is not limited to statements made in prior legal proceedings, as courts have also applied the doctrine with regard to prior inconsistent statements

made to government agencies.  *Id*. at 734 (noting "most circuits have applied judicial estoppel in cases where the first proceeding was before an agency" and collecting cases holding same); *accord Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) ("many cases have applied the doctrine where the prior statement was made in an administrative proceeding, and we are not aware of any case refusing to apply the doctrine because the prior proceeding was administrative rather than judicial" and collecting cases holding same).  In other words, "[j]udicial estoppel applies just as much when one of the tribunals is an administrative agency as it does when both tribunals are courts."  *Trs. v. United States*, 593 F.3d 1346, 1354 (Fed. Cir. 2010).  Courts applying the doctrine have estopped parties from asserting positions in subsequent legal proceedings that are contrary to statements made to government agencies for the purpose of obtaining a benefit.

For example, in *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199 (10th. Cir. 2011 ), the Tenth Circuit found that a plaintiff was barred by the doctrine of judicial estoppel from bringing a discrimination claim under Title VII premised on his claim that he was qualified for his prior job position after he previously made sworn statements to the Social Security Administration ("SSA") that he was completely disabled and received significant benefits in form of disability payments from the SSA as a result of these statements.

Similarly, in *Carpet Supermarket, Inc. v. Nat'l Fire Ins. Co. of Hartford*, 2009 WL 10675718, No. CV 09-4951-GAF (C.D. Cal. Sept. 17, 2009), the court applied the doctrine of judicial estoppel where a party advanced a position in court that was inconsistent with its position in a prior IRS filing.  The court foreclosed the plaintiff from taking a contradictory position than that which the plaintiff used as a basis for obtaining substantial tax benefits. Likewise, in *Marks v. Am. Airlines, Inc*., 313 F. App'x. 933, 934 (9th Cir. 2009), the plaintiff was

estopped from contending he was a California resident such that he was able to bring a claim under California law because for years he avoided California income tax by representing that he was a Florida resident to the California Franchise Tax Board.[13]

The facts supporting judicial estoppel are equally compelling here.  On June 7, 2021, Plaintiff submitted a Vacant Building Response form in which he affirmed that the Property is occupied. McClendon Decl., ¶8, Ex. 37, p. PRMG_Ntam 004369.  Plaintiff signed the form, affirming the information is "complete and accurate."  *Id*.  Because Plaintiff has testified under penalty of perjury that he has never moved into the Property, his representation that the Property was occupied necessarily must have referred to someone else's occupancy.  Consistent with this, after the Government of the District of Columbia, Department of Consumer and Regulatory Affairs, advised Plaintiff that his request for a property tax exemption for fiscal year 2021 had been denied because the DC Water and Pepco bills he submitted with his exemption request "show no/low usage," (SOF 69), Plaintiff submitted a Residential Lease between himself and a tenant executed on June 15, 2021 (SOF 72).  The next day, the Government of the District of Columbia, Department of Consumer and Regulatory Affairs advised that Plaintiff's request for an exemption had been approved and the Property would not be deemed vacant.  SOF 73.  In addition to avoiding payment of the $250 vacant property registration fee, the designation of the Property as tenant-occupied saved Plaintiff thousands of dollars in property taxes—nearly $20,000 per year.  SOF 74-75.

Plaintiff thus gained a substantial tax benefit by obtaining an exemption from the Department of Consumer and Regulatory Affairs that he would not have received but for his representation of the Property's occupancy by a tenant.  As a result, Plaintiff is judicially

---

[13] The California Franchise Tax Board is the state agency that collects and administers California state income taxes.

estopped from making inconsistent arguments regarding the tenant-occupancy status in this

litigation. He is bound by his representation to the Department of Consumer and Regulatory

Affairs that the Property is tenant-occupied.

PRMG is entitled to summary judgment in its favor on Plaintiff's TILA claim for this

additional reason.

> **4.  Plaintiff did not follow PRMG's reasonable instructions in sending the disputed payments, but each payment was nonetheless credited as of the date of receipt or properly returned.**

Even if Plaintiff could proceed with his claim under section 1639f (and he cannot for the

many reasons discussed above), PRMG did not violate it.  Section 1639f of TILA states as

follows:

> (a) In general
> In connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account ***as of*** the date of receipt, except when a delay in crediting does not result in any charge to the consumer or in the reporting of negative information to a consumer reporting agency, *except* as required in subsection (b).
>
> (b) Exception
> If a servicer specifies in writing requirements for the consumer to follow in making payments, but accepts a payment that does not conform to the requirements, the servicer shall credit the payment ***as of*** 5 days after receipt.

15 U.S.C. § 1639f (emphasis added).

Consistent with the above, Plaintiff admits in his complaint that "the servicer may specify

reasonable requirements for making payments in writing, such as requiring that payments be

accompanied by the account number… or specifying one particular address for receiving

payments, such as a post office box."  SAC ¶ 106 (citing Staff Commentary to 12 C.F.R. §

1026.36(c)(1)(ii)(B)).  The undisputed evidence shows that PRMG advised Plaintiff on multiple

occasions, including through the written notices of service transfer and monthly account

statements, to send his payments to an address in Newark, New Jersey starting with the

September 1, 2020 payment.  SOF 24, 27, 28.  All of these communications also referenced the account number ending in 4100 that was assigned to the Loan when Cenlar began subservicing. SOF 24, 25, 27, 28. At least two of these notices were *not* returned undeliverable. SOF 24-27

Despite these notices, Plaintiff sent the November 2020 payment to PRMG's address in Corona, California – not to the Newark, New Jersey address specified.  SOF 31.  As a result of Plaintiff's failure to send his payment to the correct address, the November 2020 payment was not immediately applied by Cenlar.  SOF 34. The funds were forwarded to PRMG's subservicer Cenlar when the clerical error was discovered on June 10, 2021, and the November payment was subsequently credited by Cenlar to the account *as of* November 1, 2020.  SOF 61, 62.  In addition, Cenlar reapplied all of the payments subsequent to November 2020 to reflect their timely receipt, waived all late fees, and instructed the CRAs to remove all negative reporting that had occurred on Plaintiff's Loan.  SOF 63, 66.

Importantly, 15 U.S.C. § 1639f(b) does not state *when* the payment must be credited by the servicer, but instead requires only that if the servicer accepts a nonconforming payment, it must be credited *as of* 5 days of receipt.  The Official Staff Commentary to section 1639f(b)'s implementing regulation, 12 C.F.R. § 1026.36(c)(1)(i), confirms: "This does not require that a mortgage servicer post the payment to the consumer's loan account *on* a particular date; the servicer is only required to credit the payment *as of* the date of receipt."  (Emphasis added.) Because Plaintiff's November 2020 payment was credited *as of* November 1, 2020 (SOF 62), albeit several months later, there was no violation of the statute.

Plaintiff next claims that PRMG violated section 1639f by returning his July 2021 payment.  However, this payment was transmitted with insufficient information to permit its application.  Cenlar received a data feed for multiple "Check Free" transactions, which included

a payment in the amount of $2,784.78 from "Ntam Constructi" for an account number ******4577.[14] SOF 84. No other identifying information was included in the transmission to Cenlar—for example, no property address or borrower name was given.  SOF 85. This payment could not be matched to any loan in Cenlar's records because it does not subservice a loan for "Ntam Constructi" (or Ntam Construction) and it does not subservice a loan bearing account number ******4577.  SOF 86.  Because the data accompanying the payment through Check Free could not be matched to a loan subserviced by Cenlar, Cenlar returned the payment through the Check Free system and notified Check Free of the return.[15]  SOF 88.

The statute, the regulation, and the Official Staff Commentary do not specify what a servicer is to do with a nonconforming payment, but logic dictates that it must be returned to the payer where, as here, the servicer is unable to ascertain the account to which the payment should be applied. The statute's text supports this interpretation:  "*If* a servicer specifies in writing requirements for the consumer to follow in making payments, *but* accepts a payment that does not conform to the requirements…."  15 U.S.C. § 1639f(b) (emphasis added).  The use of the words "if" and "but" would not have been used if the servicer were required to accept a nonconforming payment; "if" and "and" would be appropriate were that Congress's intent.

The Official Staff Commentary addressing a servicer's options for handling a partial payment provides another basis for summary judgment in PRMG's favor:

> Handling of partial payments. If a servicer receives a partial payment from a consumer, to the extent not prohibited by applicable law or the legal obligation between the parties, the servicer may take any of the following actions: [¶] …ii. Return the partial payment to the consumer….

---

[14] A full account number ending in 4577 was included in the data feed (SOF 84), but is not provided here for privacy reasons.

[15] It was only through information learned in the course of investigating Plaintiff's allegations regarding the July 2021 payment that Cenlar was able to locate the data transmission and ascertain that the payment had been received and why it was not applied. Gillespie Decl., ¶3.

Official Staff Commentary, 12 C.F.R. § 1026.36(c)(1)(ii).

The July 1, 2021 current payment due, which was disclosed to Plaintiff in his June 14, 2021 monthly statement sent to Plaintiff's Brighton Lane address and not returned undeliverable, was $2,793.55. SOF 76, 80, 81. The July 2021 payment transmitted was only $2,784.78. SOF 84. The Deed of Trust does not prohibit, and in fact, *authorizes*, return of partial payments. SOF 89. Thus, PRMG's return of the partial July 1 payment was permissible under the Staff Commentary. PRMG is entitled to judgment on Plaintiff's section 1639f claim.

### 5. Any violation of TILA by PRMG was not intentional and resulted from a bona fide error.

PRMG is entitled to summary judgment on the TILA claim for yet another reason. PRMG is not liable under TILA as a matter of law because the alleged violations were "not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1640(c).

As Plaintiff's SAC acknowledges, "the servicer may specify reasonable requirements for making payments in writing, such as requiring that payments be accompanied by the account number… or specifying one particular address for receiving payments, such as a post office box." SAC ¶106 (citing Staff Commentary to 12 C.F.R. § 1026.36(c)(1)(ii)(B)). As permitted, PRMG advised Plaintiff on multiple occasions, including through the written notices of service transfer and monthly account statements, to send his mailed payments to an address in Newark, New Jersey starting with the September 1, 2020 payment. SOF 24, 25, 27, 28. The account statements also disclose options for making payments by means other than by check, including by making payments electronically through automatic ACH transfer. *Id*. All of these communications also referenced the account number ending in 4100 that was assigned to the Loan when Cenlar began subservicing. *Id*. PRMG's procedure of telling customers where and

how to submit payments, and providing them with the account number to use in connection with such payments, is "reasonably adapted to avoid" errors in payment application. Simply put, had Plaintiff mailed the November 2020 Loan payment to the address specified, referencing the correct account number—in other words, had he followed the "reasonable requirements" for payment communicated to him repeatedly—no delay in application would have occurred.

PRMG has additional procedures, in addition to sending notices of servicing transfer and monthly account statements, that are reasonably adapted to avoid delays in processing payments that a borrower nevertheless sends to the incorrect address.  PRMG has a process in place to regularly forward payments it receives at its Corona, California address to its subservicer Cenlar if a borrower submits a payment to the Corona address after a loan has been transferred to Cenlar for subservicing.  SOF 53.  Such payments are forwarded as needed and as checks come in, but this process typically occurs several times a week.  SOF 54.  PRMG creates a spreadsheet listing the payments it has received, which includes information such as the borrower name, date of payment receipt, account numbers, and payment amount.  SOF 55.  That spreadsheet is sent to Cenlar, along with the payment funds, and Cenlar, in turn, applies such payments effective as of the date of PRMG's receipt.  SOF 56.  Multiple check payments made by Plaintiff after September 1, 2020 were handled in precisely this manner, that is, PRMG forwarded them to Cenlar, which then applied them with an effective date of PRMG's receipt.  SOF 57.  The fact that all of Plaintiff's other check payments were logged and forwarded in this manner proves that the "process is reasonably adapted to avoid" errors.  Indeed, Plaintiff concedes that this process worked (i.e., the procedure did in fact "avoid errors") as to all of his incorrectly addressed payments bearing the wrong loan number, with the exception of the November 2020 payment. McClendon Decl., Ex. 31 at 87:16-88:22.

Despite PRMG's maintenance of procedures reasonably adapted to avoid payment processing delays, a clerical error occurred: *a single check*, the November 2020 payment, was not logged on the spreadsheet of payments to be sent to Cenlar.[16]  SOF 58.

Plaintiff's claim under section 1639g stems from the same clerical error as the 1639f claim.  His interrogatory responses assert that PRMG provided an inaccurate payoff quote in April 2021 because it did not account for one of his payments (i.e., the missing November 2020 payment) and thus the payoff quote improperly showed the Loan as one month past due, as well as associated late fees and interest charges.  McClendon Decl., Ex. 35, p. 21-22.  The payoff quote generated in April 2021 was accurate based on Cenlar's records at the time, which reflected the missed November 2020 payment.  SOF 90.  In other words, Plaintiff would have no dispute regarding the payoff quote were it not for the clerical error in processing the November 2020 payment.

Bona fide clerical errors such as these are exempted from liability under TILA.  "A creditor or assignee may not be held liable in any action brought under this section or section 1635 of this title for a violation of this subchapter if the creditor or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.  Examples of a bona fide error include, but are not limited to, ***clerical***, calculation, computer malfunction and programing, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error."  15 U.S.C. § 1640(c) (emphasis added); *accord Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 526 F.

---

[16] Plaintiff cannot maintain a claim regarding PRMG's return of his July 2021 payment because it did not include any identifying account information and because it was only a partial payment, as explained in the preceding section.

Supp. 815, 822 (D.D.C. 1981) (TILA exempts liability for bona fide errors, including clerical errors that occurred despite the maintenance of procedures reasonably adapted to avoid such error); *see In re Thomas*, No. 12-41045-JJR13, 2013 WL 1953537, at *3 (Bankr. N.D. Ala. May 10, 2013) (creditor was not liable for violating TILA where such violation was the result of "an unintentional bona fide computer programming error" and creditor "failed to catch" the misplaced disclosure despite adapting reasonable procedures to avoid such error, including consulting computer programmer to write program for the purpose of generating compliant disclosure forms and personal review of such forms by the creditor).

Because the undisputed evidence shows that the alleged violations of TILA were the result of a clerical error despite the maintenance of procedures reasonably adapted to avoid such violations, PRMG is not liable under TILA.

### C. Plaintiff's first cause of action for violation of RESPA must fail as to PRMG and Cenlar.

Plaintiff's first count for violation of RESPA fails because (1) the evidence shows that PRMG in fact suppressed the credit reporting for the required timeframe, and (2) RESPA does not apply to Plaintiff's Loan.

#### 1. PRMG suppressed its credit reporting upon receipt of Plaintiff's QWR.

Plaintiff's first count for violation of RESPA alleges that PRMG and Cenlar did not suppress credit reporting following receipt of his QWR in violation of 12 U.S.C. § 2605(e)(3) or 12 C.F.R. § 1024.35(i)(1).  SAC ¶ 101.  PRMG did not violate either provision.

These sections generally prohibit a servicer from furnishing adverse credit information on an account for a period of 60 days after the servicer's receipt of a QWR relating to a dispute regarding the borrower's payments.  RESPA specifically provides, "[d]uring the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request

relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency…." 12 U.S.C. § 2605(e)(3).  Implementing Regulation Z at 12 C.F.R. § 1024.35(i)(1) similarly states, "after receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error."

Cenlar received Plaintiff's QWR on February 22, 2021.  SOF 39, 40.  The same day, Cenlar suspended credit reporting for the Loan for a period of (more than) 60 days.  SOF 41.  It accomplished this by entering the code "QWR60D" into its servicing system on February 22, 2021. SOF 42.  Cenlar did not make any credit reporting regarding Plaintiff's loan in March 2021, April 2021, or May 2021.  SOF 43.  Its February reporting had occurred on February 5, 2021, before the date of the QWR.  *Id.*  Cenlar did not resume credit reporting on the Loan until June 7, 2021.  SOF 45.  PRMG did not itself ever make any reports to the CRAs concerning Plaintiff's Loan payments, as this function is handled by its subservicer Cenlar.  SOF 44.

Plaintiff is expected to argue in response that Cenlar had a duty to instruct the credit reporting agencies to remove any *prior* negative credit reporting upon receipt of Plaintiff's QWR.  Not so.  Section 2605(e)(3) explicitly only requires a servicer not to make certain adverse credit reporting "beginning on the date of the servicer's receipt" of the QWR.  The Regulation is the same.  12 C.F.R. § 1024.35(i)(1) ("after receipt of a notice of error, a servicer may not, for 60 days…).  There is simply no requirement under these sections to delete or to take any other action with respect to information previously furnished to the CRAs.  *Eichholz v. Wells Fargo Bank, NA*,  No. 10–cv–13622, 2011 WL 5375375, at *6 (E.D. Mich. Nov. 7, 2011) (noting that statute only precludes reporting in 60-day period after receipt of QWR and further finding

causation of damages cannot be established under § 2605(e)(3) if negative credit reporting occurred before date of QWR); *Corazzini v. Litton Loan Servicing LLP*, No. 1:09-CV-199, 2010 WL 6787231, at *13 (N.D.N.Y. June 15, 2010) (allegation that defendant placed "incorrect and derogatory information on [her] credit report ***before*** the statutory mandated time frame" was insufficient to defeat summary judgment on section 2605(e)(3) claim where defendant demonstrated that it did not furnish information during the 60-day period proscribed by RESPA) (emphasis added).

Because the undisputed evidence shows that neither PRMG nor Cenlar furnished information to the CRAs during the 60 days *after* Cenlar received Plaintiff's QWR, PRMG and Cenlar are entitled to summary judgment in their favor on Plaintiff's first count for violation of RESPA.

### 2. RESPA does not apply because Plaintiff's Loan was not primarily for personal use.

RESPA "does not apply to credit transactions involving extensions of credit... primarily for business, commercial, or agricultural purposes." 12 U.S.C. § 2606(a). In interpreting this provision, courts have found that RESPA does not apply to loans for non-owner-occupied rental properties. *Henok v. Chase Home Fin., LLC*, 950 F. Supp. 2d 96, 98 (D.D.C. 2013) (discussing RESPA statutory and regulatory framework) (citing *Johnson v. Wells Fargo Home Mortg., Inc*., 635 F.3d 401, 417 (9th Cir. 2011) and *Henok v. Chase Home Finance*, Civil Action No. 12–336(RWR), 2013 WL 2352104, at *1 (D.D.C. May 30, 2013)). Further, as the *Johnson* case notes, the Official Staff Commentary states that "[c]redit extended to acquire, improve, or maintain rental property (regardless of the number of housing units) that is not owner-occupied is deemed to be for business purposes...." 12 C.F.R. Pt. 226, Supp. I, Cmt. 3(a)(4).

Such is the case here.  As explained above in connection with Plaintiff's TILA claim, neither Plaintiff nor any family member has ever lived in the Property in the two years since its purchase.  SOF 15.  This alone demonstrates a business purpose; if the Property truly were for personal use, Plaintiff or at least a family member would have moved in at some point in the last two years.

The additional evidence discussed above in connection with the TILA claim further shows that the credit was obtained primarily for business use.  Most significantly, Plaintiff sought to rent out the Property ***three days*** after the July 23, 2020, Loan closing (if not earlier).  SOF 6.  Then, ***five days*** after obtaining the Loan, Plaintiff entered into a Non-Management Rental Listing Agreement with Keller Williams Capital Properties to list the Property for rent.  SOF 7.  The Property was advertised for rent on the MLS and approximately 200 websites, and at least one open house was scheduled. SOF 8.  Plaintiff's real estate agent Marie-Claire Ntam negotiated with real estate agents representing several prospective tenants, received applications from prospective tenants, and met with and fielded other real estate agents' questions about the Property over several months.  SOF 9.  These efforts culminated in Plaintiff's execution of ***two lease agreements*** for the Property, one on November 17, 2020 with a tenant named Rachel Bennett, and the other on June 15, 2021 with a tenant named Desha Butler.  SOF 13.  Plaintiff regularly texted with his real estate agent Marie-Claire Ntam about the rental listing of the Property, discussing such matters as suitability of tenants and tenant parking issues.  SOF 10.  Plaintiff was actively engaged in evaluating prospective tenants based on factors such as income, rental history with other landlords, and credit criteria.  SOF 11.  Importantly, Plaintiff himself referred to the Property as a ***"business venture"*** in a text to Marie-Claire Ntam.  SOF 12.  Ntam Construction, LLC makes all payments on the Loan from its bank account; no Loan payments

have been made from Plaintiff's personal checking account.  SOF 19, 20.  Finally, and most

importantly, in order to avoid having to pay a vacant property registration fee, and in order to

obtain a continued property tax exemption, Plaintiff represented the Property to be occupied and

supported his assertion with a Residential Lease between himself and a tenant executed on June

15, 2021. SOF 67-72.  Because of his provision of this Residential Lease to the Government of

the District of Columbia, Department of Consumer and Regulatory Affairs, Plaintiff avoided

classification of the Property as "vacant," which would likely have caused his property taxes to

increase by nearly $20,000 per year.  SOF 73-75.

      The evidence shows that the extension of credit was primarily for business purposes.

And, Plaintiff is judicially estopped from arguing that the Property was not tenant-occupied, for

the reasons explained above.  RESPA does not apply.  PRMG and Cenlar are entitled to

judgment in their favor on Plaintiff's first count for this reason.

     **D.  Plaintiff's third count for violation of RESPA must fail as to PRMG and Cenlar.**

      Plaintiff's third count for violation of RESPA fails because (1) RESPA does not apply to

Plaintiff's Loan, and (2) the evidence shows that PRMG in fact properly responded to Plaintiff's

QWR.

       **1.  RESPA does not apply because Plaintiff's Loan was not primarily for personal use.**

      PRMG demonstrated in the preceding section of this brief that Plaintiff's Loan was

primarily for business use, making RESPA inapplicable.  Plaintiff is judicially estopped from

arguing otherwise because of his representations to a government agency regarding the

Property's occupancy by a tenant that resulted in a monetary benefit to him.  That argument and

evidence apply equally to Plaintiff's third count for violation of RESPA.  PRMG and Cenlar are entitled to summary judgment for this reason.

### 2.   PRMG properly responded to Plaintiff's QWR.

Plaintiff's third count claims that PRMG and Cenlar violated RESPA by failing to properly respond to his QWR.  SAC ¶¶ 113-115.

RESPA imposes a duty on loan servicers to take certain actions upon receipt of a qualified written request, or QWR, from a borrower seeking information relating to the servicing of a loan. 12 U.S.C. § 2605(e)(1)(A). A QWR is "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer," that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower."  12 U.S.C. § 2605(e)(1)(B).

Within 5 business days of receiving a QWR, a loan servicer must provide a written response to the borrower acknowledging receipt. 12 U.S.C. § 2605(e)(1)(A). Within 30 business days of receipt (absent a 15-day extension), the loan servicer must either (1) correct the errors complained of in the borrower's QWR, (2) provide a written explanation or clarification as to why the borrower's account is, in fact, correct, or (3) provide a written explanation or clarification as to why the information requested in the QWR is unavailable. 12 U.S.C. § 2605(e)(2)(A)-(C).  Section 2605 further permits servicers to extend the 30-business day response deadline by informing the borrower in writing that it is taking a 15-day extension.  12 U.S.C. § 2605(e)(4).

Plaintiff first claims that PRMG and Cenlar violated section 2606(e)(3) of RESPA by failing to provide *any* response to his QWR. SAC ¶ 49. This claim is easily disposed of. On February 19, 2021, Cenlar received Plaintiff's QWR. SOF 39, 40. Cenlar acknowledged receipt of Plaintiff's QWR in writing on February 22, 2021. SOF 46. Cenlar then informed Plaintiff that it required the 15-day extension permitted by RESPA on March 24, 2021, thus extending its response deadline. SOF 47. Cenlar's investigation confirmed that the November 2020 payment had not been received by Cenlar, and it confirmed its findings to Plaintiff in written correspondence to Plaintiff's address of record on Brighton Lane dated April 6, 2021. SOF 48.

Cenlar mailed its written response to the QWR on April 8, 2021, as shown in its outgoing mail log. SOF 49. The QWR response bears the number 528667 in the lower left hand corner, which matches the number in the "NCP Job ID" column on the mail log. SOF 50. The mail log also references Plaintiff's loan number ending in 4100. SOF 51. While Plaintiff denies receiving the letter, it was in fact mailed and was not returned undeliverable. SOF 52.

Plaintiff alternatively claims that PRMG failed to conduct a reasonable investigation into his dispute, alleging PRMG's (1) failure to provide information requested in his QWR, (2) failure to provide a substantive response, and (3) failure to correct errors identified in his QWR. SAC ¶ 115. These claims are also not supported by the evidence.

Plaintiff's QWR disputed that he failed to make the November 2020 payment. As set forth above, Cenlar had not received the November 2020 at the time of its April 2021 QWR response because Plaintiff did not send the November 2020 payment to the designated address, and due to a clerical error, PRMG did not forward the payment to Cenlar until June 10, 2021. SOF 31, 58, 61. Cenlar conducted a reasonable investigation into Plaintiff's dispute, but its records confirmed that the November 2020 payment had not been received. SOF 48. Indeed,

not only was the November 2020 payment not received by Cenlar, it was (due to a clerical error) also not included in any of the spreadsheets listing payments forwarded to Cenlar by PRMG. SOF 58.

In responding to Plaintiff's QWR, Cenlar properly relied on several facts known to it based on its course of dealing with PRMG.  *First*, it knew that both it and PRMG send notices of servicing transfer to customers when a loan is transferred to Cenlar for subservicing, and these letters tell the borrower where to send mailed payments (in this instance, to an address in Newark, New Jersey). SOF 24, 27.  *Second*, Cenlar knows that it sends monthly account statements to borrowers telling them how they can make payments, including the address they should use to mail any payment by check.  SOF 28, 29.  Again, the law permits Cenlar to require payments be submitted to a designated address.  *Third*, Cenlar knew that PRMG has procedures in place to promptly and regularly forward to it checks that borrowers send directly to PRMG's Corona, California address notwithstanding instructions to borrowers otherwise.  SOF 53-56.

The fact that Cenlar did not locate and apply the November 2020 payment in connection with its April 2021 QWR response does not support a claim under RESPA.  Notably, RESPA only requires a servicer to "after conducting an investigation, provide the borrower with a written explanation or clarification that includes (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower."  12 U.S.C. § 2605(e)(2)(B).  In other words, if the servicer's reasonable investigation concludes that there is not an error on the account, there is no duty to correct any error.  *Barr v. Flagstar Bank, FSB,*

303 F. Supp. 3d 400, 419 (D. Md. 2018) (finding no violation where servicer did not correct the error alleged in QWR because it "researched the issue and found that no error occurred.").

Further, Cenlar's QWR response included the statutorily required explanation. Cenlar's response confirmed that it did not believe an error existed and provided its reasons supporting this belief, along with documentation.  SOF 48.  Cenlar's response further provided the name and phone number of the office or department who could provide further assistance to Plaintiff.  *Id*. Thus, Cenlar's response to Plaintiff's QWR complied with RESPA.

Simply put, liability under RESPA does not turn on whether a servicer's response to a QWR is perfect or accurate.  Rather, RESPA merely requires a servicer to conduct a reasonable investigation and to provide a response based on the results of the investigation.  The fact that the November 2020 payment was discovered two months after Cenlar sent its QWR response does not render Cenlar's prior response improper under the RESPA or its investigation unreasonable. Cenlar's investigation was reasonable based on the information at that time.  And after PRMG discovered record of the November 2020 payment in June 2021, Cenlar credited Plaintiff's account as of November 1, 2020 and reversed all late charges and negative credit reporting.  SOF 63, 66.  There was no violation of RESPA by PRMG.

### E.   Cenlar is entitled to summary judgment on both RESPA claims because it is not a "servicer" within the meaning of RESPA.

Finally, and in addition to the reasons set forth above, Cenlar is entitled to judgment in its favor on each of Plaintiff's RESPA claims against it because Cenlar is not a "servicer" as defined in RESPA.  As numerous courts have held, the applicable provisions of RESPA only apply to a loan "servicer" and not to a subservicer or agent of the servicer.

Plaintiff's claim that Cenlar is liable under RESPA contradicts RESPA's implementing regulations. These regulations differentiate between a "master servicer" like PRMG and a

"subservicer" like Cenlar:  "Master servicer means the owner of the right to perform servicing. A master servicer may perform the servicing itself or do so through a subservicer." 12 C.F.R. § 1024.31. "Subservicer means a servicer that *does not own the right* to perform servicing, but that performs servicing *on behalf of* the master servicer." *Id*. (emphasis added); *see also* 12 U.S.C. § 2605(i)(2) ("The term 'servicer' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)."). In promulgating 12 C.F.R. § 1024.31, the "Definitions" section for the RESPA regulations, the Consumer Financial Protection Bureau (CFPB) explicitly rejected equating "subservicers" and "servicers" under RESPA. *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696-01 (concluding that "any servicer that does not own the servicing right but performs servicing on behalf of a servicer that owns the servicing right is a subservicer.").

Consistent with the regulations, several courts have held that subservicers or agents of servicers are not "servicers" under RESPA.  *McDonald v. OneWest Bank, FSB*, 929 F. Supp. 2d 1079, 1095 (W.D. Wash. 2013) (RESPA does not apply to subservicer as a matter of law); *In re Coleman*, No. 06-00254, 2009 WL 9061560, at *10 (Bankr. D.D.C. May 11, 2009) (dismissing complaint against servicer's attorneys because RESPA "does not identify the servicer's counsel as an authorized agent of the servicer for purposes of receiving and responding to RESPA requests."). As one Court held:

> [There is no] statutory liability under RESPA for [an agent], even though [the agent] is not itself a servicer, simply because it was acting as the agent of a servicer. . . . Had Congress intended for § 2605(k) to apply to servicers and their agents, it could have said so explicitly. Likewise, had the CFPB intended for 12 C.F.R. § 1024.41 to apply to servicers' agents, it could have easily written the regulation accordingly. The Court therefore concludes that [an agent of the servicer], as a non-servicer, cannot be held liable for violations of 12 U.S.C. § 2605(k) or 12 C.F.R. § 1024.41.

*Farber v. Brock & Scott, LLC*, No. CV TDC-16-0117, 2016 WL 5867042, at *4–5 (D. Md. Oct. 6, 2016). Another federal court held as follows:

> Although a borrower's agent is mentioned in RESPA, there is no corresponding reference to a servicer's agent. "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" Because Congress refers to a borrower's agent but does not reference a servicer's agent in the applicable section of statute, the court concludes Congress intentionally excluded the servicer's agent [from RESPA liability].

*Kee v. Fifth Third Bank*, No. 2:06CV00602CW, 2009 WL 735048, at *4 (D. Utah Mar. 18, 2009) (*quoting Russello v. U.S.*, 464 U.S. 16, 23 (1983)).

PRMG owns the servicing rights to Plaintiff's Loan and has owned such rights since the Loan was originated.  SOF 22.  Cenlar was engaged by PRMG to be the subservicer for the Loan on behalf of PRMG.  *Id*.  Cenlar does not own and has never owned the servicing rights to Plaintiff's Loan. *Id*.

Indeed, Plaintiff's own SAC admits that Cenlar is not the servicer of the Loan:

> PRMG is the principal who has engaged Cenlar to act on its behalf, using PRMG's name, and with PRMG's authority in relation to the Plaintiff and the RESPA Class and certain of the TILA Class members. PRMG and the members of Defendant Class have agreed to permit and expressly authorized Cenlar to act as their authorized vendor (while using their names) to partially service the Plaintiff's and TILA Class members' loans to perform a standard range of services for them including: payment processing, maintaining records of payments and balances, collecting and making disbursements for tax and insurance payments, sending monthly statements, etc. However, neither PRMG nor the members of Defendant Class have notified the Plaintiff and members of the TILA Class that the servicing has been officially transferred to Cenlar pursuant to 12 U.S.C.A. § 2605(b)(c). PRMG and the members of Defendant Class remain the *prime servicer* in relation to the Plaintiff's loan and the loans of the RESPA Class and TILA Class members and *Cenlar is simply an entity engaged by them to perform certain functions* they are required to perform in relation to the Plaintiff and the members of the RESPA Class and TILA Class.

SAC ¶ 16(d)) (emphasis added).

Section 2605 of RESPA addresses "servicers" only; it does not reference "subservicers" or agents of servicers. 12 U.S.C. § 2605. "It is not a judge's job to add to or otherwise re-mold statutory text to try to meet a statute's perceived policy objectives." *Fourstar v. Garden City Grp.*, Inc., 875 F.3d 1147, 1152 (D.C. Cir. 2017). "Instead, [courts] must apply the statute as written." *Id*. Here, the "statute as written" only applies to "servicer[s]" and not to subservicers like Cenlar.

Because Cenlar is only the subservicer of Plaintiff's Loan, Plaintiff cannot prevail on his claims for violation of RESPA against Cenlar.  Accordingly, Cenlar is entitled to judgment in its favor as to Plaintiff's first and third counts for violations of RESPA.

## IV.    CONCLUSION

For all the reasons set forth in detail above, PRMG and Cenlar are entitled to summary judgment in their favor.  Alternatively, PRMG and Cenlar are each entitled to partial summary judgment as to each of the counts alleged in the SAC.

DATED:  September 2, 2022                  Respectfully submitted,


                                           /s/ *Regina J. McClendon*
                                           Thomas J. Cunningham
                                           Bar No. FL0090
                                           tcunningham@lockelord.com
                                           Dale A. Evans Jr.
                                           Bar No. FL0091
                                           dale.evans@lockelord.com
                                           Locke Lord LLP
                                           777 South Flagler Drive
                                           East Tower, Suite 215
                                           West Palm Beach, FL 33458
                                           Phone: (561) 833-7700

                                           Regina J. McClendon

Bar No. CA00112
rmcclendon@lockelord.com
Lindsey E. Kress (*pro hac vice*)
lkress@lockelord.com
Locke Lord LLP
101 Montgomery Street, Suite 1950
San Francisco, CA 94104
Phone: (415) 318-8810

Carlos Marin
Bar No. IL6326103
carlos.marin@lockelord.com
Locke Lord LLP
111 S. Wacker Dr.
Chicago, IL 60606
Phone: (312) 443-1837

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing via the Court's CM/ECF system on September

2, 2022 to:

| | |
|---|---|
| Phillip R. Robinson<br>Consumer Law Center LLC<br>10125 Colesville Road, Suite 378<br>Silver Spring, MD 20901<br>Email: phillip@marylandconsumer.com | Brent S. Snyder<br>2125 Middlebrook Pike<br>Knoxville, TN 37921<br>Email: brentsnyder77@gmail.com |
| Robert P. Cocco<br>1500 Walnut Street, Suite 900<br>Philadelphia, PA 19102<br>Email: bob.cocco@phillyconsumerlaw.com | |

/s/ *Regina J. McClendon*
Regina J. McClendon

127099398